United States Court of Appeals,

Eleventh Circuit.

No. 97-6808

Argument Calendar.

Margaret T. ALLEN, Yolanda F. Lamar, et al., each individually and on behalf of others similarly situated, Plaintiffs-Appellees,

Board of Trustees for Alabama State University;  Eria P. Smith, et al., Intervenors-Plaintiffs-Appellees.

v.

The ALABAMA STATE BOARD OF EDUCATION;  Fob James, et al., Defendants-Appellants.

Jan. 11, 1999.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-81-T-697-N), Myron H. Thompson, Judge.

Before BIRCH and BARKETT, Circuit Judges, and ALAIMO[*], Senior District Judge.

BARKETT, Circuit Judge:

Appellant Alabama State Board of Education ("the Board") appeals from an adverse decision of the district court rejecting its motion to vacate a consent decree entered in 1987.  The consent decree successfully ended Allen's civil rights class action against the Alabama State Board of Education challenging under the Equal Protection Clause and various federal civil rights laws, principally Title VI and Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, the Board's requirement that applicants for state teacher certification pass certain standardized tests.  The Board argues that the district court should have vacated the consent decree because (1) it has fully complied with it, notwithstanding that it has not implemented the testing safeguards required by the

[*]Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

decree, and (2) because the decree contains race-conscious measures that violate the Equal Protection Clause. Because the Board has failed to show that the district court abused its discretion in denying the motion to vacate the consent decree, we affirm.

BACKGROUND

In 1985, the attorneys for the parties reached an agreement in the form of a consent decree to settle this case. The Board attempted to withdraw from the settlement, but this Court ultimately held that the consent decree was enforceable. *Allen v. Alabama State Bd. of Educ.,* 816 F.2d 575 (11th Cir.1987). The consent decree was finally approved and entered on May 14, 1987.

The decree first provided for the immediate certification of teachers who had failed the challenged tests and granted fairly modest monetary relief to plaintiffs that had been denied certification—$ 400 for each class member and an additional $ 5000 for the four named class representatives. The decree also provided that any future certification examinations would be fashioned by using a system designed to avoid an unjustifiable discriminatory impact on African-Americans teacher candidates, and specifically forbade the use of any teacher certification examination that would have a discriminatory impact on African-Americans unless that exam had been validated for teacher certification. Most importantly, the decree required the Board, in developing new tests, to follow what is known as the "Golden Rule" methodology and provided for the creation of an independent monitoring panel to oversee the test development process.[1] In

[1]Under this methodology, which was named for the first case in which it was used, *Golden Rule Life Insurance Co. v. Mathias,* 86 Ill.App.3d 323, 41 Ill.Dec. 888, 408 N.E.2d 310 (Ill.Ct.App.1980), the Board must submit proposed questions to a large scale field-test to measure the item difficulty or "p-value" for African-American and white candidates. The consent decree divides proposed items into three categories: Type I, where the item difficulty for African-American and white candidates differs by no more than five percent, Type II, where the p-value differential is greater than five percent but no more than ten percent, and Type III, where the p-value differential is greater than ten percent but no more than fifteen percent.

exchange, Plaintiffs gave up the opportunity to seek a more substantial award of backpay for the class. *See Richardson v. Lamar County Bd. of Educ.,* 729 F.Supp. 806 (M.D.Ala.1989) (awarding reemployment and backpay to teacher who was terminated after failing the same teacher certification tests challenged here), *aff'd sub nom. Richardson v. Alabama State Bd. of Educ.,* 935 F.2d 1240 (11th Cir.1991).

After the consent decree was entered in 1985, the Board notified the district court of its intent to develop a new teacher certification examination and a monitoring panel was appointed. Although the Board received a proposal to develop a test consistent with the consent decree from one major test developer, by the fall of 1988, the Board decided to suspend their efforts to develop a new test. From 1988 to 1995, the Board did not require candidates for teacher certification to pass an examination. Instead, it allowed teachers to be certified based on the degrees they earned at school and other criteria—an option permitted under the consent decree.

In June 1995, the Alabama legislature directed the Board to "review the requirements of programs for teacher education and select a nationally normed teacher examination to be used." Ala.Code § 16-3-16.1(a). After this statute was passed, plaintiffs moved for a preliminary injunction enjoining enforcement of the statute and the Board moved to vacate the consent decree. After letting the parties conduct discovery and holding a one-day trial, the district court denied both motions. *Allen v. Alabama State Bd. of Educ.,* 976 F.Supp. 1410 (M.D.Ala.1997) (denying motion to vacate

---

In devising any new test, the Board is to use only Type I items "so long as they are available in sufficient numbers to provide comprehensive coverage of the objectives sought to be measured in the examination." Where Type I items are insufficient to create a valid exam, the consent decree allows the Board to use Type II items as well. However, if the supply of both available Type I and Type II items are insufficient to create a valid exam, the Board could also use a limited number of Type III items—no more than ten percent of the total number of items unless the monitoring panel agreed otherwise.

consent decree); *Allen v. Alabama State Bd. of Educ.,* 983 F.Supp. 1084 (M.D.Ala.1997) (denying preliminary injunction). The Board then filed this interlocutory appeal of the district court's denial of its motion to vacate the consent decree.

DISCUSSION

Before addressing the merits of this appeal, we must first consider whether we have jurisdiction to entertain it. Allen argues that we lack jurisdiction because the district court denied the Board's motion without prejudice, permitting the Board to return after making a good faith effort to develop a certification test consistent with the consent decree. We conclude that we have jurisdiction based on the plain language of 28 U.S.C. § 1292(a)(1), which confers appellate jurisdiction over orders "granting, *continuing,* modifying, refusing or dissolving injunctions, or *refusing to dissolve or modify injunctions* (4)27" (emphasis added). This provision gives us jurisdiction to hear an interlocutory appeal of a district court's refusal to vacate a consent decree containing injunctive relief. *See Kerwit Med. Prods., Inc. v. N & H Instruments, Inc.,* 616 F.2d 833, 836 (5th Cir.1980) (treating denial of Rule 60(b) motion to vacate consent judgment as a " "interlocutory order' continuing or refusing to dissolve an injunction which is appealable under § 1292(a)(1)"). Accordingly, we turn to the merits of the Board's appeal.

Rule 60(b)(5) of the Federal Rules of Civil Procedure allows a district court to vacate or modify a consent decree when "it is no longer equitable that the judgment should have prospective application...." We reverse a trial court's decision whether to vacate a consent decree, however, only if there is an abuse of discretion. *See Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1563 (11th Cir.1994). As Justice O'Connor noted in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), "[d]etermining what is "equitable' is necessarily a task that entails substantial discretion, particularly in a case like this one, where the District Court must make

complex decisions requiring the sensitive balancing of a host of factors." *Id.* at 393-94, 112 S.Ct. 748 (O'Connor, J., concurring). Accordingly, the Board faces a heavy burden in seeking to overturn the district court's denial of its 60(b) motion. "It is not enough that the granting of relief might have been permissible, or even warranted—denial must have been so *unwarranted* as to constitute an abuse of discretion." *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396, 402 (5th Cir. Unit A Jan.1981) (emphasis in original). We find no abuse of discretion here.

It is well-settled that, before a consent decree may be terminated, the party seeking termination of the decree must show that the basic purposes of the decree have been fully achieved and that there is no significant likelihood of recurring violations of federal law once the decree has been lifted. *See Board of Education of Oklahoma City Pub. Sch. v. Dowell,* 498 U.S. 237, 246-50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *United States v. City of Miami,* 2 F.3d 1497, 1505-06, 1508 (11th Cir.1993). Under *Dowell* and *Miami,* therefore, the trial court must consider whether the defendant has carried its burden of proving that it complied with the decree in good faith by fulfilling the decree's basic objectives and eliminating any vestiges of past discrimination. *Dowell,* 498 U.S. at 247, 249-50, 111 S.Ct. 630; *Miami,* 2 F.3d at 1505. Further, the trial court must consider whether it is "unlikely that the school board [will] return to its former ways" if the decree is vacated. *See Dowell,* 498 U.S. at 247, 111 S.Ct. 630; *Miami,* 2 F.3d at 1508 (noting need for the district court to determine whether the consent decree is "necessary ... to prevent discrimination in the future"); *see also Inmates of Suffolk County Jail v. Rufo,* 12 F.3d 286, 292 (1st Cir.1993) ("Implicit in [*Dowell* 's] requirements is the need for the district court ... to be satisfied that there is relatively little or no likelihood that the original ... violation [of federal law] will promptly be repeated when the decree is lifted.").

In 1985, the Board suspended teacher certification examinations, issued teacher certifications

to the 429 class members who had failed the challenged certification tests, and paid the class members the liquidated damages provided by the consent decree. The Board argues that this constitutes full compliance with the consent decree and that if it wants to now reinstitute testing, it should not be forced to fashion tests consistent with the provisions of the consent decree. However, one of the primary purposes of the consent decree was to ensure that any future testing requirements did not impose an unjustified racially discriminatory impact on African-American teacher candidates. *Dowell* and *Miami* teach us that a district court may deny a motion to dissolve a consent decree where its basic purposes have not been fully achieved, requiring the defendant to make further efforts to comply with the decree. *Dowell,* 498 U.S. at 247, 111 S.Ct. 630; *Miami,* 2 F.3d at 1505. Sounding a similar theme, the Supreme Court's decision in *Rufo* indicates that where a party knowingly takes on burdens in a consent decree, a court may demand that the party "ma[k]e a reasonable effort to comply with the decree" before it "should be relieved of the undertaking under Rule 60(b)." *Rufo,* 502 U.S. at 385, 112 S.Ct. 748; *see also Cooper v. Noble,* 33 F.3d 540, 544 (5th Cir.1994) (noting *Rufo*'s insistence that "the petitioning party must "ma[k]e a reasonable effort to comply with the decree' ") (quoting *Rufo,* 502 U.S. at 385, 112 S.Ct. 748).

Because, as the district court recognized, the future-testing requirements went to the heart of the consent decree to which the parties agreed, the district court was well within its discretion in concluding that the consent decree should not be vacated at this time because "defendants have not made a good-faith effort to develop a test that both meets the requirements of the consent decree and is psychometrically sound or even to find out whether such a test can be developed ...." *Allen,* 976 F.Supp. at 1414. As the Third Circuit noted in rejecting an analogous argument that a decree forbidding a union from engaging in secondary picketing should be vacated because the union had refraining for six years from *all* picketing:

> [T]he unions have not engaged in any picketing for a large portion of the six years. There is therefore no background upon which any findings could be made that would show that [the union] has in fact learned how to picket without treading on the prohibitions against secondary boycotts contained both in the law and the various negotiated consent decrees. [The union's] statement that it "has fully transformed its conduct into a model of lawful compliance" must be evaluated in light of that decision not to picket at all.... Under these circumstances, the mere passage of a six-year period of alleged compliance with the decrees cannot be the basis for a modification of the decrees.

*Building & Construction Trades Council v. NLRB,* 64 F.3d 880, 890 (3d Cir.1995). This is exactly the situation here.

There is nothing in the record to support the Board's claim that the district court abused its discretion in concluding that it was premature to find that the Board would not return to its former use of discriminatory certification examinations. To the contrary, the district court noted that the Board, shortly after agreeing to settle, attempted to escape from its obligations under the consent decree. After the attempt was rejected, the Board sought to develop a new test, but never did so even though there were test developers willing to design a test consistent with the consent decree. The Board did not present to the district court the new test which it plans to use, nor did it advise the court what cutoff will be selected by the Board for a passing grade, describe how the test will be validated, or how the Board will attempt to minimize discriminatory impact against African-American teacher candidates.

Our holding does not "condemn [the Board] ... to judicial tutelage for the indefinite future." *Dowell,* 498 U.S. at 249, 111 S.Ct. 630. The district court recognized that once a test is developed within the decree's specifications, the decree will become irrelevant. Alternatively, should the Board submit proof that the consent decree's provisions prevent the development of a valid test, modification may well be in order at a later time. *Allen,* 983 F.Supp. at 1088-89; *Allen,* 976 F.Supp. at 1431 n. 115. Considering all the circumstances, we cannot say that the district court abused its wide discretion in refusing to lift the consent decree until the Board made a good-faith effort to

comply with its future testing provisions or present other evidence to satisfy the district court that the requirements of *Dowell* and *Miami* have been met.

We now turn to the Board's argument that the consent decree's future testing provisions contain race-conscious measures that cannot survive strict scrutiny under the Equal Protection Clause. The Board argues that the standards governing race-based governmental action has changed significantly since the consent decree was approved, making the district court's refusal to modify an abuse of discretion. It is undisputed that the district court was required to modify, but not vacate, the consent decree to the extent that some of its provisions ran afoul of the Equal Protection Clause based on a significant change in the law. The Supreme Court's recent precedents concerning the validity of race-conscious government action "altered the legal landscape" in place at the time the consent decree in this case was approved and "*Rufo* ... requires that consent decrees be modified to avoid any violations of governing constitutional standards." *Ensley Branch,* 31 F.3d at 1564. Accordingly, we turn to consider whether the Board has shown that the decree's future testing provisions are subject to strict scrutiny based on intervening Supreme Court precedents governing race-based governmental action.

In *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court held that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* at 224. *Adarand* 's strict scrutiny standard is plainly applicable where the government distributes burdens or benefits along racial lines, granting a preference or imposing a penalty to individuals because of their race. *Adarand* teaches us that strict scrutiny applies in such instances because the government has subjected individuals to unequal treatment based on race. *Id.* at 229-30, 115 S.Ct. 2097 ("[W]henever the

government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection.").[2] By contrast, where the government does not exclude persons from benefits based on race, but chooses to undertake outreach efforts to persons of one race, broadening the pool of applicants, but disadvantaging no one, strict scrutiny is generally inapplicable. *See Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1557-58 (11th Cir.1994) (treating such recruiting and out-reach efforts as "race-neutral"); *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1551-52 (M.D.Ala.1995) (distinguishing between inclusive and exclusive race-conscious measures and holding that inclusive techniques, which "seek to ensure that as many qualified candidates as possible make it to the selection process," are not subject to the "traditional ... equal protection analysis that courts have used for techniques of exclusion").

In this case, under the consent decree, the Board may develop a new test to be used in making teacher certification decisions for African-American and white candidates alike. The decree does not require the Board to impose a different passing grade for African-American candidates or otherwise classify teachers based on race in grading the examinations. In this respect, the decree does not require the Board to act according to racial classifications, which takes this case out of *Adarand.* Instead, the Board must be conscious of race in developing the examination, choosing test

---

[2]To be sure, there is some language in *Adarand* suggesting that all race-based actions, whether or not they lead to unequal treatment, are subject to strict scrutiny. *See Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. Courts, however, have not accepted this broad reading of *Adarand. See Lutheran Church-Missouri Synod v. FCC,* 154 F.3d 487, 492 (D.C.Cir.1998) ("We ... do not claim ... that all race conscious measures adopted by the government must be subjected to strict scrutiny."); *Raso v. Lago,* 135 F.3d 11, 16 (1st Cir.) (reading *Adarand* as applicable to a "government standard, preferentially favorable to one race or another, for the distribution of benefits"), *cert. denied,* --- U.S. ----, 119 S.Ct. 44, --- L.Ed.2d ---- (1998); *Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 711 (9th Cir.1997) ("*Adarand* applies only when the government subjects a "person to unequal treatment.' ").

items to minimize any racially disparate impact within the framework of designing a valid and comprehensive teaching examination. Nothing in *Adarand* requires the application of strict scrutiny to this sort of race-consciousness.

Further, to do so would imperil Title VII, which requires covered employers to ensure that their selection processes do not result in an unjustifiable discriminatory impact on African-American candidates. As the First Circuit recently explained, "[e]very antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under a statute, reflects a concern with race. That does not make such enactments or actions ... automatically "suspect' under the Equal Protection Clause." *Raso,* 135 F.3d at 16; *see also Lutheran Church-Missouri Synod v. F.C.C.,* 154 F.3d 494, 502 (Tatel, J., dissenting from denial of rehearing en banc) ("[A] vast range of antidiscrimination laws ... require public and private entities to be conscious of race not only in outreach and recruitment, but also in hiring and promotion. Surely such laws do not implicate strict scrutiny. What triggers strict scrutiny, then, is not mere race-consciousness, but rather unequal treatment based on race.").

Our cases are consistent with this view. In *Ensley Branch,* we held that race-conscious hiring provisions contained in certain consent decrees were not narrowly tailored to a compelling state interest. We emphasized that instead of enforcing these racial preferences, the district court should have required the defendant to follow "the single most important race-neutral alternative" in the decree: "the requirement that the Board develop and put in place non-discriminatory selection procedures...." *Ensley Branch,* 31 F.3d at 1571. We explained that the defendant

> was quite properly ordered to implement selection procedures that *either* had no disparate impact on blacks and women *or* that, despite having disparate impact, were "job-related" as that term is used in Title VII. Moreover, if the Board chose the second approach, adopting procedures that were job-related despite having some disparate impact, then the Board was required to search for selection procedures that were equally job-related but with less adverse impact. These decree provisions roughly parallel the requirements of Title VII,

which mandates that an employer either use a selection procedure with no adverse impact or a job-related selection procedure that has no more adverse impact than other, equally job-related selection procedures.

*Id.* (emphasis in original). *Ensley Branch* envisions a process whereby governmental employers must be conscious of race in developing job selection procedures, ensuring that neutral selection procedures do not in fact result in a discriminatory impact on African-American candidates. Our holding in *Ensley Branch* that the Equal Protection Clause does not forbid consent decree provisions that require governmental entities to take race into account in formulating non-discriminatory selection procedures applies equally here.

We find further support for our holding in the Supreme Court's decision in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and its progeny. *Shaw* recognizes that "race consciousness [in the drawing of districting lines] does not lead inevitably to impermissible race discrimination," *id.* at 646, 113 S.Ct. 2816, but occurs "where "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines'...." *Bush v. Vera,* 517 U.S. 952, 958, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (quoting *Miller v. Johnson,* 515 U.S. 900, 913, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)). "For strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were "subordinated' to race." *Id.* at 959, 116 S.Ct. 1941. As the Supreme Court has recognized, *Shaw* requires a "more searching inquiry" before applying strict scrutiny because a legislature's drawing of district lines does not classify persons by race but rather "classifies tracts of land, or addresses," and because race-consciousness is inherent in the process of creating district lines. *See Bush,* 517 U.S. at 958-59, 116 S.Ct. 1941; *Shaw,* 509 U.S. at 646, 113 S.Ct. 2816.

Similar factors are present here. As in *Shaw,* the Board does not classify persons by race when it chooses which items to include on a test. Rather, it classifies test items. Under the consent

decree, the Board is aware of race and racial impact when selecting test items, but this awareness, as in *Shaw,* "does not lead inevitably to impermissible race discrimination," *id.,* because, under Title VII, the creation of a test as a selection procedure for employment demands that the test creator be aware of race and avoid imposing an unnecessary discriminatory impact on African-American candidates. Application of *Shaw* here leads to the conclusion that the district court did not abuse its discretion in refusing to modify the consent decree. The decree does not permit racial considerations to predominate over legitimate testing principles. Indeed, it does just the opposite. As the district court explained, "[v]alidity and soundness trump any need to redress discriminatory impact." *Allen,* 976 F.Supp. at 1431. Because the Board has failed to show any change in the law rendering the consent decree's future testing provisions invalid under the Equal Protection Clause, the district court did not abuse its discretion in denying the Board's Rule 60(b) motion on this ground.

Accordingly, the judgment of the district court is AFFIRMED.