[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-13499

_____

FILED

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**October 29, 2003**
**THOMAS K. KAHN**
**CLERK**

D. C. Docket No. 87-00369-CV-T-24

MILLER FRANK JOHNSON, LLOYD KOGER, et al.,

Plaintiffs-Appellees,

UNITED STATES OF AMERICA,

Intervenor-Plaintiff-Appellee,

versus

STATE OF FLORIDA, et al.,

Intervenor-Defendants,

KATHLEEN KEARNEY, Secretary,
Department of Children and Families,

Intervenor-Defendant-Appellant.

_____

No. 02-14670

_____

D. C. Docket No. 87-00369-CV-T-24

MILLER FRANK JOHNSON, LLOYD KOGER, et al.,

Plaintiffs-Appellees,

UNITED STATES OF AMERICA

Intervenor-Plaintiff-Appellee,

versus

DICK BRADLEY, G. PIERCE WOOD MEMOR, et al.,

Defendants-Appellants,

STATE OF FLORIDA, JEB BUSH, Governor of
the State of Florida, et al.,

Intervenor-Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(October 29, 2003)**

Before ANDERSON and COX, Circuit Judges, and NANGLE[*], District Judge.

ANDERSON, Circuit Judge:

These consolidated cases arise out of litigation against the State of Florida

("the State") over conditions at a former state-run mental health facility, G. Pierce

Wood Memorial Hospital ("GPW"), which closed in February 2002. In the first

case, #02-13499 ("the Consent Decree case"), the State[1] challenges the district

---

[*]Honorable John F. Nangle, United States District Judge for the Eastern District of
Missouri, sitting by designation.

[1]The principal named Defendant, Bradley, is the former Superintendent of GPW.
Because the suit is in substance one against the State of Florida, "the State" will be used to refer

court's refusal to lift all conditions of a Consent Decree under which GPW was subject to court-supervised monitoring. The Consent Decree was entered to settle litigation between a plaintiff class of patients and the State regarding conditions of confinement, treatment and release at the hospital. In the second case, #02-14670 ("the attorney fee case"), the State challenges the district court's order refusing to award attorneys' fees incurred in defending claims brought by the Justice Department as Intervenor on behalf of the patients. The State won on all counts at a bench trial, and claims it is statutorily entitled to attorney fees as the prevailing party.

## I.   BACKGROUND

Until its closure, GPW was a state-run hospital for the mentally ill, at which approximately 85 percent of the patients were involuntarily committed by court order under a Florida statute known as the "Baker Act." A group of patients at GPW brought a class action in the Middle District of Florida in November 1987, alleging that the State was violating their constitutional rights by providing substandard care and housing, and by failing to release them when they were "discharge ready." Specifically, the complaint alleged that the State: (1) violated their rights under the Fourteenth Amendment by failing to discharge them into less

_____

to the Defendants in the aggregate.

3

restrictive settings; (2) denied them procedural due process in violation of the Fourteenth Amendment by arbitrarily revoking privileges without formal standards and with no opportunity for challenge; (3) abridged their First, Ninth and Fourteenth Amendment rights by arbitrarily restricting visitation privileges; (4) infringed their right to counsel in violation of the First, Fifth, Sixth and Fourteenth Amendments by failing to provide legal assistance or an adequate law library, and (5) violated their Fourteenth Amendment rights by providing inadequate medical staffing, recreation, vocational training, security and nutrition.

The court certified a class of "all persons who are now or will in the future be committed" to GPW, and a subclass of present and future patients "who have been determined by their treatment team to be 'discharge ready' for a period of 15 days or longer, but who have not been discharged." Significantly, the court later expanded the class to include "former patients at GPW even after they are discharged into community treatment facilities."

In June 1989, the parties entered into a Consent Decree, under which the State agreed to make various changes in operations at GPW. A preamble to the decree, entitled "Scope of Agreement," stated that the decree was binding upon "[d]efendants and their successors, agents, servants and employees." The only portion of the order at issue is the district court's refusal to terminate court

4

supervision as it relates to three paragraphs of the Consent Decree: ¶¶ 2, 35, and 37. In Paragraph 2, the State agreed to begin assigning clients to living units and programs according to their individual functional levels and therapeutic needs. The State further agreed that:

> As community facilities become available ... this shall include moving residents from (1) more to less structured living; (2) larger to small living facilities; (3) group to individual residence; (4) segregated from the community to integrated into community living; (5) dependent to independent living, according to their needs and as more specifically set forth in the Comprehensive Services Plan for the Alcohol and Mental Health Program ... attached hereto and incorporated by reference.

Id. at ¶ 2. Paragraph 35 requires the parties to agree on the selection of a monitor to oversee compliance with the agreement, and Paragraph 37, which is similar to Paragraph 2, deals with the state's obligation to evaluate when patients are "discharge ready" and, subject to the availability of funding, to place them in appropriate community settings.

The decree expressly provided that it was subject to court approval, and that "[c]ompliance/non-compliance with this Agreement shall be determined by the Court." In other words, the parties clearly contemplated a continuing oversight role for the court. The Consent Decree was filed with the district court as a settlement agreement. After conducting a fairness hearing, the court approved the

5

decree by order of August 14, 1989, reserving jurisdiction to oversee its implementation.

Because the State's obligations under the decree were somewhat general, the parties agreed after several years of oversight by the monitor to develop criteria by which the state's compliance could be measured. Accordingly, they entered into two additional agreements (the "Exit Criteria"). There were two sets of Exit Criteria – one governing the provision of legal services and one regarding the adequacy and timeliness of placement in community treatment – but only the latter is at issue here. The parties reduced their agreement to an "Exit Criteria Stipulation," which they agreed to submit to court approval. In the stipulation, the parties agreed that the Exit Criteria would be "the sole and exclusive method for assessing Defendants' performance and determining completion of his remaining obligations and the termination under the consent decree except as otherwise accepted by the parties and approved by the Monitors and the Court." Among other specifications, the stipulation provided that reports of the monitor evaluating the State's compliance with the exit criteria would be appealable to the district

6

court and subject to *de novo* judicial review. Notably, the Exit Criteria purported in several instances to modify obligations imposed by the Consent Decree.[2]

In December 1994, the State moved for the first time to withdraw from the Exit Criteria. The State, evidently having concluded that it entered into an unfavorable bargain, argued that the stipulation exceeded the scope of the case as defined by the Complaint and the Consent Decree. It further argued that the executive branch officials who entered into the Exit Criteria overstepped their authority by purporting to bind legislative policymakers into the future. The motion was summarily rejected and the Exit Criteria remained in force.

In June 1996, the Justice Department moved to intervene in the case on the Plaintiffs' side under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* ("CRIPA"). CRIPA empowers the Attorney General to bring or join litigation seeking injunctive relief on behalf of persons confined in state or municipal institutions, if there is reasonable cause to believe that the confinees are being subjected to "egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that

---

[2]To cite but one example, one provision of the Exit Criteria, regarding the Defendants' obligation to install an elevator, stated: "Delete consent decree requirement pursuant to agreement of Plaintiffs and Office of the Monitor."

7

such deprivation is pursuant to a pattern or practice (of violations)." <u>See</u> 42 U.S.C. § 1997(a). The DOJ Complaint accused the State of violating the Fourteenth Amendment and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*, by failing to protect patients from harm, failing to provide the level of care appropriate to meet the patients' liberty interests, and failing to ensure that each patient was placed in the most appropriate setting for his needs.

The State denied all of the DOJ allegations, and the case went to a five-week bench trial during August and September of 2000. At the start of the trial, the State announced that it had decided to close GPW (although the State contends that its intentions were known before the trial). However, because the parties had agreed in the pretrial order to limit the evidence presented at trial to that developed before September 30, 1999, the planned closure was not part of the record at trial. The original class Plaintiffs actively participated in the trial and sought affirmative relief beyond that provided under the Consent Decree.

Following the trial, the district court issued an opinion on June 28, 2001, ruling for the State on all counts of the DOJ complaint. The court concluded that as of September 30, 1999, the State was providing a constitutionally adequate level of care under the standard set forth in <u>Youngberg v. Romeo</u>, 457 U.S. 307, 102 S.Ct. 2452 (1982). <u>Youngberg</u> recognized that patients involuntarily committed to

8

state custody enjoy a substantive due process right to "reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." Id. at 324, 102 S.Ct. at 2462. To determine what is a reasonable level of care, courts were instructed only to "make certain that professional judgment in fact was exercised," id. at 321, 102 S.Ct. at 2461, not to second-guess the outcome of that judgment. Applying Youngberg, the district court reviewed each category of services and conditions at GPW and found all of them to comply with accepted standards of professional judgment. As to the particular services at issue here, the court found that "[c]urrent and former GPW patients are provided adequate community mental health services to meet their assessed functional and clinical needs in an integrated setting that is appropriate to those needs." It further found that the State was "providing an appropriate array and intensity of community services," and that "all aspects of the defendants' provision of community services comply with accepted professional standards of care."

As the prevailing party, the State moved for an award of attorney fees and costs against the DOJ pursuant to CRIPA, 42 U.S.C. § 1997c(d). The request was referred to a Magistrate Judge, who recommended granting the petition for $351,139.45 in costs but denying the request for attorneys' fees on the grounds that

CRIPA did not mandate an award of fees to prevailing defendants. The district court adopted the Magistrate's Report and Recommendation and denied attorney fees. The State appealed, giving rise to Case No. 02-14670.

On July 20, 2001, the State filed a Supplemental Motion to Terminate Consent Decree, based on the district court's findings after the DOJ trial that the State was providing a constitutionally adequate level of care. Before that motion could be decided, GPW officially closed as of February 11, 2002. The State followed up on February 21, 2002, with a Supplemental Motion to terminate the decree, arguing that closure of GPW mooted any outstanding issues. The district court granted the State's motion to vacate in large part, but denied it as to three provisions of the Consent Decree that are at issue here. In the Order, discussed in detail in Section II.A., which follows, the court found that the State was not entitled to relief from those provisions – which concern the placement of former patients in community programs – because it had not shown that the violations of federal law proscribed by the Consent Decree and Exit Criteria would not recur. The State appealed, giving rise to Case No. 02-13499.

## II. DECISIONS BELOW

A. <u>The Consent Decree – Case # 02-13499</u>

The district court heard argument on May 23, 2002, on the State's Motion to Terminate Consent Decree and Exit Criteria Stipulation and its Supplemental Motion to Terminate Consent Decree. The court did not take evidence at the hearing. The court issued its order on June 3, 2002, granting in part and denying in part the State's two motions.

The district court found that the parties were in agreement that closure of GPW mooted most provisions of the Consent Decree and exit criteria regarding conditions of hospitalization, and therefore granted the motions to vacate regarding those provisions. The court then turned to the three provisions disputed here. The court decided that the proper legal framework for analyzing a motion to vacate a consent decree was set forth in United States v. City of Miami, 2 F.3d 1497, 1508 (11th Cir. 1993), and Allen v. Alabama State Bd. of Educ., 164 F.3d 1347, 1350 (11th Cir. 1999).[3] City of Miami and Allen employ a two-prong inquiry, under which the court first looks to whether "the basic purposes of the decree have been fully achieved." Allen, 164 F.3d at 1350. If so, the court then must find that "there is no significant likelihood of recurring violations of federal law once the decree has been lifted." Id. The court rejected the State's suggestion that the standard of

[3]The court recognized that Allen was vacated as a result of a settlement between the parties, see 216 F.3d 1263 (11th Cir. 2000), but still found its approach useful as persuasive authority for how the Circuit would treat a motion to vacate.

11

Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748 (1992), should govern, because Rufo dealt with a motion to modify a decree, not a motion to vacate. Applying the City of Miami framework, the court looked first to whether the basic purposes of the decree had been achieved. The court focused on the State's argument that the order of June 28, 2001, following the DOJ trial (hereinafter, the "Bench Trial Order") was conclusive as to the State's compliance with the Consent Decree and exit standards. The court noted that the Bench Trial Order expressly stated that the purpose of the trial was not to evaluate the State's obligations under the Consent Decree. However, the court acknowledged that its findings of fact – that the State was making appropriate community placements as of the time of the trial – suggested that basic purpose of the decree was being achieved with respect to the patients hospitalized as of September 1999, and with respect to patients discharged as of that date.

The court further found, however, that even if the Bench Trial Order indicated that the basic purposes of the decree were being achieved as of the time of the DOJ trial, that finding was not conclusive as to the "great number" of patients discharged between the trial and GPW's shutdown in February 2002. Because there was no evidence that those remaining patients had been discharged in compliance with the Community Compliance Exit Criteria, the court could not

12

conclude that there was no significant likelihood of a recurring violation of federal law if the decree were lifted. Consequently, the court denied the State's motion to vacate the three disputed paragraphs of the decree.

B.    Attorney Fees – Case # 02-14670

The district court issued its Order denying the State's request for attorney fees on August 5, 2002. In its Order, the district court agreed with the Magistrate Judge that Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694 (1978), provided the proper legal standard by which to evaluate the petition. Under Christiansburg, a prevailing defendant in a civil-rights action may be awarded attorneys' fees when it is shown that the plaintiff's case was "frivolous, unreasonable, or without foundation," but the defendant need not show that the case was actually brought in bad faith.

The court rejected the State's suggestion that the more lenient standard of Geier v. Richardson, 871 F.2d 1310 (6th Cir. 1989) – under which the prevailing party is presumptively entitled to attorneys' fees regardless of whether the case is shown to be frivolous – was appropriate when attorneys' fees are sought against the Government in a CRIPA action. Instead, the court held that Christiansburg should provide the standard because: (1) the legislative history of CRIPA indicates that Congress intended for prevailing legal standards under other civil-rights statutes to

13

apply, which meant Christiansburg; (2) CRIPA's fee-shifting language is similar to that in other civil-rights statutes to which Christiansburg applies, and (3) the policy considerations behind Christiansburg – to provide an incentive for aggrieved parties to enforce civil-rights laws and to punish wrongdoing defendants – were similarly applicable to CRIPA, thus indicating that attorney fee awards were principally intended for prevailing plaintiffs and not defendants.

Applying Christiansburg, the court agreed with the Magistrate Judge that the State had not shown that the DOJ's case was frivolous. The court noted that the State did not even move for summary judgment, that the trial was substantive – lasting for 23 days and involving the testimony of numerous experts – and that the DOJ's case was supported by allegations of death or serious injury to many patients. The court rejected the State's contention that DOJ should have scaled back its claims upon learning of the imminent closure of GPW, because the hospital in fact remained open for two more years, during which time the allegedly unconstitutional conditions could have continued to harm patients.[4]

III.    DISCUSSION

A.    The Consent Decree – Case # 02-13499

---

[4]The court agreed with the Magistrate Judge that the State was entitled to its court costs and litigation expenses. That part of the Order is not challenged on appeal.

A consent decree is a judgment, and thus subject to Rule 60(b), which provides in part that a party may obtain relief from a final judgment if "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). A party seeking modification of a consent decree bears a heavy burden of persuasion. See Sierra Club v. Meiburg, 296 F.3d 1021, 1034 (11th Cir. 2002) ("A party seeking to modify a consent decree has a high hurdle to clear and the wind in its face."). Generally, however, indefinite federal court oversight of state institutions is disfavored, and a federal court should terminate supervision once the defendant comes into compliance with the law. See Ensley Branch, NAACP v. Seibels, 31 F.3d 1548, 1574-75 (11th Cir. 1994) ("Remedial decrees should require the responsible officials to end their unconstitutional action posthaste. Remedial decrees should not foster prolonged oversight and management by the least representative branch."). A district court's decision to modify, or not modify, a consent decree is reviewed for abuse of discretion. Jacksonville Branch, NAACP v. Duval County Sch. Bd., 978 F.2d 1574, 1578 (11th Cir. 1992). We review for clear error the findings of fact on which a modification decision is based. Id.

The thrust of the State's argument on appeal is that the district court should have vacated the Consent Decree because of changes of fact and law. With respect to the former, the State argues that the DOJ Bench Trial established that there are no longer constitutional violations, and that fact coupled with the closure of GPW, under a proper application of the Rufo standard, warranted vacation of the Decree. The State also argues that D.W. v. Rogers, 113 F.3d 1214 (11th Cir. 1997) constitutes a change of law and that, as a result of that decision, states have no constitutional duty to provide mental health services after patients have been discharged from state custody.[5] Finally, the State suggests that, in the absence of a violation of federal law, the district court may have lacked jurisdiction to continue enforcing the decree. Specifically, the State contends that, in order to apply the narrow exception to state Eleventh Amendment immunity for prospective injunctive relief recognized by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441 (1908), the court must find that the defendant is engaged in an *ongoing* violation of federally protected rights.

---

[5]D.W. involved a substantive due process challenge to the state of Alabama's practice of "wait-listing" mentally ill children who had been civilly committed to state custody for treatment of mental illness. The court held that, because the state had not yet assumed physical custody of the child plaintiffs – at most, it had legal custody – the plaintiffs had no due process right to any particular level of treatment. See id. at 1218, 1220.

We first address the district court's formulation of the City of Miami standard under which it assessed the State's petition for relief. We then turn to the court's application of that standard to the facts.

1.    The Rufo and City of Miami standards

Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748 (1992), involved a long-running class action by pretrial detainees challenging the conditions of their confinement, including overcrowding, poor sanitation, and cramped cells. The district court found that conditions at the jail were so onerous as to constitute punishment without benefit of trial, in violation of the Fourteenth Amendment. The court set a deadline for the county to cease using the substandard facility, and ordered that replacement facilities be readied. In response to that order, the parties entered into a consent decree that obligated the county to provide modernized housing with specified amenities and living space. But during the pendency of the consent decree, two things happened: first, jail population grew faster than expected, and second, the Supreme Court clarified the amount of inmate living space that was constitutionally required. These developments prompted the county to move to modify the consent decree on the basis of changed circumstances.

The Court held that the rigorous showing required by <u>United States v. Swift & Co.</u>, 286 U.S. 106, 52 S.Ct. 460 (1932) for relief from a court-approved settlement agreement – "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" – was impractically rigid in dealing with institutional reform litigation, because of the strong public interests at stake. Rather, the <u>Rufo</u> Court held, a decree can be modified if the party seeking modification shows "a significant change in circumstances" – either of fact or of law – warranting revision. <u>Rufo</u>, 502 U.S. at 383, 112 S.Ct. at 760. If such showing is made, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." <u>Id.</u> The Court elaborated on possible changed circumstances: (a) "changed factual conditions make compliance with the decree substantially more onerous" than was contemplated; (b) the decree "proves to be unworkable because of unforeseen obstacles," or (c) "enforcement of the decree without modification would be detrimental to the public interest." <u>Id.</u> at 384-85, 112 S.Ct. at 760.

In <u>United States v. City of Miami</u>, 2 F.3d 1497, 1508 (11th Cir. 1993), we applied <u>Rufo</u> in the context of a motion to modify or vacate a consent decree in a class-action discrimination case. In that case, the Justice Department sued the City of Miami, alleging that minorities and women suffered widespread employment

18

discrimination in the fire department and other city agencies. The parties averted trial by entering into a consent decree calling for reforms in the hiring and promotion process, which the district court entered as its judgment. Some years later, a firefighters' union – which was granted intervenor status – sought to modify or vacate the decree on the grounds that the decree had achieved its purpose of diversifying the fire department's ranks.

In considering whether to modify the decree, we observed – citing <u>Rufo</u> – that the first step was to determine the "basic purpose" of the agreement. <u>Id.</u> at 1504. If the modification was directed to that basic purpose, it would likely frustrate that purpose and was therefore impermissible; if it was directed only to "one of several means of accomplishing the purpose ... or one of several means of measuring compliance," then it might be permitted. <u>Id.</u> at 1505.

We then evaluated whether the decree could be lifted rather than merely modified. We again began with the first prong of <u>Rufo</u>: determine the "basic purpose." Then – citing <u>Bd. of Educ. of Okla. City Pub. Sch. v. Dowell</u>, 498 U.S. 237, 111 S.Ct. 630 (1991),[6] which preceded <u>Rufo</u> by a year – we said:

_____

[6]<u>Dowell</u>, like <u>Rufo</u>, was an "institutional reform" case, in that instance a desegregation case against the Oklahoma City school system. The district court had entered an injunction directing the school district to adopt a busing plan designed to integrate schools in single-race neighborhoods. After several years of active court supervision, the court granted the school system's motion to close the case, but did not vacate the injunction. When the school system later sought to adopt a new school assignment system, a group of parents moved to reactivate

19

> [O]n remand, the district court must determine whether the decree's basic purpose of eliminating the effects of past discrimination has been achieved ... In determining whether the decree's purpose has been fulfilled, the district court should consider whether the City has complied in good faith with the decree and whether the vestiges of past discrimination have been eliminated to the extent practicable. ... In sum, termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent discrimination in the future or to remedy the effects of past discrimination.

Id. at 1508 (internal quotes omitted).

In the case at bar, the district court treated Rufo and City of Miami as mutually exclusive standards – the former applicable only to requests to modify a decree, and the latter appropriate where a party seeks to be relieved from the decree entirely. Accordingly, it applied only City of Miami. While we disagree with the district court's characterization of these cases, its approach did not constitute reversible error, particularly in light of the nature of these Defendants' petition for relief.

---

court supervision under the injunction, alleging that the system was out of compliance. The district court denied the parents' motion and vacated the injunction, but the Tenth Circuit reversed, relying on the Swift "grievous wrong" standard. The Supreme Court, presaging Rufo, held that Swift was too inflexible a yardstick for assessing the continued usefulness of a consent decree involving school desegregation, because such decrees are necessarily temporary and require leeway for local innovation. Rather, the Court – in phrasing we adapted in City of Miami – formulated the proper inquiry as "whether the [school system] had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." Dowell, 498 U.S. at 249-50, 111 S.Ct. at 638.

In our view, the City of Miami formulation is merely a gloss or a method of applying Rufo, not a distinct standard. See Bldg. & Constr. Trades Council v. NLRB, 64 F.3d 880, 888 (3rd Cir. 1995) (applying Rufo to a request to modify or terminate injunction, but enumerating flexible list of factors similar to those in City of Miami, including "whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction"). City of Miami itself made no attempt to limit the application of Rufo or to distinguish it. The City of Miami court did not treat the requests to modify and to vacate the consent decree as two analytically distinct matters; rather, it discussed them together. See id., 2 F.3d at 1505 ("We find that the principles articulated in Rufo and Dowell are applicable to requests to *modify or terminate* decrees in employment discrimination class actions, like the one before us.") (emphasis added).

To put it another way, we do not read City of Miami as indicating that a district court is without authority to terminate a consent decree (as opposed to merely modifying it) if – to use Rufo's formulation – changed circumstances have caused compliance with the decree to become substantially more onerous, or have rendered the decree impracticable, or its continued enforcement inimical to the

21

public interest. Nor do we understand the district court to have believed its discretion was so constrained.[7] We therefore discern no prejudicial error in the district court's method of analysis.

The State petitioned for relief from the decree principally based on the court's findings at the DOJ Bench Trial that GPW was providing a constitutionally adequate level of care. That development could be considered a change in law or fact (what the State would call a "Rufo case"), but it could just as easily be considered a finding of substantial compliance with the decree (what the State concedes would be a "City of Miami" case). This substantial overlap is one reason that we think it was inappropriate for the district court to attempt to draw a bright line between Rufo and City of Miami where none exists.

The situation is similar with respect to the closure of GPW. Again, while this claim could be viewed as one of changed factual circumstances, it could also be treated as a claim of substantial compliance (in that all of the patients had been

---

[7]That the court fully understood the breadth of its discretion is evident in the fact that it did selectively vacate most strictures of the Consent Decree, as the State requested, leaving in place only those substantive provisions governing discharges into community placement, as to which it was not satisfied the State had shown compliance.

successfully discharged).  Again, there is nothing inconsistent between City of Miami and Rufo, and we find no reversible error in the district court's analysis.[8]

## 2. Substantive claims

We turn then to the State's substantive arguments.  It argues that three post-decree developments of law and fact required the district court to vacate the remaining portions of the decree: (1) our decision in D.W. v. Rogers, 113 F.3d 1214 (11th Cir. 1997), addressing a state's obligation to provide mental health treatment to persons in legal but not physical custody; (2) the Bench Trial Order, which found no ongoing violations of substantive due process in the provision of care at GPW; and (3) the closure of the hospital.  The State argues that these developments make it inequitable to continue enforcing the Decree (what the State labels a Rufo argument) and make it unlikely that constitutional violations, if they occurred at all, will recur (its City of Miami argument).  The State variously phrases its argument that the Decree should be vacated, sometimes arguing for lifting the Decree because there are no constitutional violations (and none likely), and sometimes arguing in quasi-jurisdictional terms (that the exception to Eleventh

---

[8]Rufo, by its terms, applies where compliance with the terms of a decree becomes substantially more onerous or impracticable because of changed circumstances.  Here, the State's claim is just the opposite – that later developments in effect *lowered* the burden of compliance so that there was nothing left for the decree to accomplish.

Amendment immunity recognized in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441 (1908), requires an ongoing violation of a federally protected right).

Before turning to the substance of this argument, we address the threshold matter of the burden of proof. We reject the State's suggestion that the burden of proof should be placed on the Class Plaintiffs. To the contrary, the Supreme Court in Rufo clearly held that the burden of proof is on the party seeking modification of a consent decree. Rufo, 502 U.S. at 393, 112 S.Ct. at 765 ("[A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance."); accord City of Miami, 2 F.3d at 1504 (quoting Rufo); see also Hodge v. Dep't of Housing & Urban Dev., 862 F.2d 859, 862 (11th Cir. 1989) (holding that burden is on party seeking relief from final judgment under Rule 60(b) to establish grounds for relief). The State's conclusory assertions of lack of jurisdiction are unpersuasive.

Even the Seventh Circuit cases on which the State relies hold that, in the context of a Rule 60(b) motion for relief from a consent decree, the burden is on the party seeking relief to establish that changed circumstances warrant relief from the decree. See David B. v. McDonald, 116 F.3d 1146, 1149 (7th Cir. 1997) (quoting Rufo: "a party seeking modification of a consent decree bears the burden

24

of establishing that a significant change in circumstances warrants revision of the decree"); accord United States v. Krilich, 303 F.3d 784, 789-90 (7th Cir. 2002); United States v. Rueth Dev. Co., 335 F.3d 598 (7th Cir. 2003). The district court properly placed the burden of proof on the State..

> (a)  The D.W. decision

The State argues that D.W. v. Rogers, 113 F.3d 1214 (11th Cir. 1997), constituted a change in the governing law which warrants termination of the Consent Decree. The State argues that it was completely absolved of all constitutional duty and all responsibility once GPW was closed and the patients discharged from that hospital. For several reasons, we decline the State's invitation to order a termination of the Consent Decree on this ground at this stage of the litigation.

The district court noted that the D.W. decision was distinguishable in that it did not involve a consent decree. The State's initial brief responds simply by asserting in conclusory fashion that that distinction is irrelevant. Because the State offers no analysis or authority to guide our review, and because the matter has not been addressed by the district court, we decline to address the issue further.[9]

---

[9]Similarly, the State asserts in conclusory fashion that the Exit Criteria are unenforceable. Again, we decline to address this argument which has also not been addressed by the district court. To the extent that the State is asserting as a factual matter that the Exit Criteria were not

In any event, even if the State could persuade us that it is completely absolved of any and all responsibility the moment a patient is released from its physical custody (which of course we do not address and do not decide), the State would still not be entitled to a termination of the Consent Decree at this stage. The State has acknowledged that, as to some undetermined subset of patients, their release from GPW did not end their stay in the State's physical custody. For example, counsel for the State conceded at oral argument that approximately 90 patients were considered too ill to be discharged when the time came to leave GPW, and were transferred to custodial settings in other state hospitals.[10] Consequently, because there was insufficient factual evidence that all discharged GPW patients were out of the State's physical custody – and indeed, a strong contrary indication that some were not – the State did not carry its burden of showing that none of the released patients had a continuing due process right to

---

adopted by the district court as an amendment or supplement to the Consent Decree, we prefer that the district court interpret its own order in the first instance. To the extent that the State is asserting some unspecified legal argument, we would insist that the State articulate any such argument clearly, and support same with analysis and authorities; and in any event, we would prefer for any such argument to be addressed in the first instance by the district court.

[10]Aside from this comment at oral argument, the record is absolutely silent with respect to the placement of the patients discharged since the September 1999 cut-off date for the DOJ litigation, and with respect to the placement of other patients as to which there is some record evidence, the district court has not addressed whether any or all of such placements constitute physical custody in the state vel non. See, e.g., Taylor v. Ledbetter, 818 F.2d 791, 795-96 (11th Cir. 1987) (en banc).

26

adequate care, even under the State's reading of D.W.  As a result, the State has not established that no live controversy existed among the parties, or that further constitutional violations could not occur.

Finally, the State has failed to address the fact that the D.W. decision did not address the issue which the State apparently wants to raise in the instant case. D.W. merely stands for the narrow proposition that a State's duty to provide treatment does not begin until a state assumes physical custody of the person as well as legal custody.  By contrast, in the instant case, the state clearly assumed constitutional duties with respect to the patients by assuming physical custody. The issue here is the point at which such duty ends.  We decline to address that novel and difficult issue for several reasons.  The issue has been inadequately addressed in the briefs on appeal, and was not addressed at all by the district court. Moreover, whether or not a release from physical custody relieves a state of the duty it had assumed may depend upon the circumstances surrounding the release. See Wakefield v. Thompson, 177 F.3d 1160 (9th Cir. 1999); Davis v. Brady, 143 F.3d 1021 (6th Cir. 1998); see also Marsh v. Butler County, Ala., 268 F.3d 1014, 1039 n.19 & 20 (11th Cir. 2001) (en banc).  There is no record evidence at all with respect to the discharge of patients from GPW from and after September 1999; it

would be unwise to attempt resolution of the legal issue in the absence of concrete facts.

(b)     Closure of GPW

Our foregoing discussion applies equally to the State's argument that the closure of GPW and release of all its patients terminates any live federal interest in continued enforcement of the decree. For the reasons above mentioned, the State has failed to establish that there are not ongoing constitutional violations and that none are likely to recur; at this stage of the litigation the State has failed to carry its burden of proving that the alleged changes of fact and law warrant vacation or further revision of the Consent Decree.

(c)     The Bench Trial Order

The State argues that the DOJ Bench Trial established that there are no ongoing constitutional violations and none likely to recur. We do not believe that the court's findings in the Bench Trial Order that conditions at GPW met substantive due process standards were conclusive as to the separate proceeding challenged here.

The issue before the district court during the DOJ bench trial was a relatively discrete one: whether, as of September of 1999, the State was violating the Fourteenth Amendment and the ADA by failing to protect patients from harm,

28

failing to provide the level of care appropriate to meet the patients' liberty interests, and failing to ensure that each patient was placed in the most appropriate setting for his needs upon release from the hospital. In ruling on the instant motion, the district court acknowledged that, although the bench trial findings were not phrased in terms of compliance with the Consent Decree, the findings were tantamount to a declaration that conditions at GPW met the basic requirements of the decree with respect to the patients still hospitalized as of September 1999 and with respect to patients discharged to less restrictive settings as of that date. However, the court further found that its observations about the level of care as of the bench trial did not conclusively establish that the level of care was constitutionally adequate as of June 2002 or that violations could not recur. In particular, the district court noted that the Bench Trial Order did not address at all the circumstances surrounding the discharge of patients from GPW after September 1999. We agree.

In order for the findings at the bench trial to be preclusive in the separate proceeding at issue here, the State would have to show that: (1) the issue was identical in both the prior and current action; (2) the issue was actually litigated; (3) the determination of the issue was critical and necessary to the judgment in the prior action; and (4) the burden of persuasion in the subsequent action is not significantly heavier than in the prior proceeding. Agripost, Inc. v. Miami-Dade

29

County, 195 F.3d 1225, 1230 n.11 (11th Cir. 1999); In re Bilzerian, 153 F.3d 1278, 1281 (11th Cir. 1998). The State has failed to show that all prerequisites for the application of collateral estoppel were met here.

The DOJ was required at the bench trial to prove its claims of ADA and Fourteenth Amendment violations by a preponderance of the evidence. Here, however, the State bore the burden of establishing grounds for relief in moving to vacate the Consent Decree. Because of the differential burdens, a finding that the DOJ could not demonstrate that the State was violating substantive due process or the ADA was not the same thing as saying that the State could demonstrate affirmatively its satisfaction of its constitutional obligations. See Young & Co. v. Shea, 397 F.2d 185, 188 (5th Cir. 1958)[11] (refusing to apply collateral estoppel to jury verdict in administrative proceeding before Commissioner of Labor over entitlement to workers' compensation benefits because "the fact that a worker could not convince a jury that he had suffered an injury should not estop him from attempting to convince a Commissioner that he was injured inasmuch as the standard of persuasion is less before the Commissioner than before the court"); accord In re St. Laurent, 991 F.2d 672, 677 (11th Cir. 1993).

---

[11]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), this Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Even more important, the issues in the DOJ bench trial and in this Rule 60(b) proceeding were not identical. In the latter proceeding, the court was properly concerned not merely with whether the State had achieved compliance with constitutional standards at one point, but whether it was presently in compliance. See Dowell, 498 U.S. at 248, 111 S.Ct. at 637 (stating that court, in deference to local control of schools, should dissolve desegregation decree "after the local authorities have operated in compliance with it for a reasonable period of time"). Also, and significantly, the placement of patients recently discharged from GPW is a factual development subsequent to, and distinct from, the events at issue in the DOJ trial. The Bench Trial Order therefore cannot be decisive as to whether the State was violating the constitutional rights of later-discharged patients.[12]

For the foregoing reasons, the State has not yet established the absence of ongoing constitutional violations, e.g., with respect to those patients discharged since September 1999, and has not established that constitutional violations will

---

[12]In addition, the constitutional violations alleged by the original class plaintiffs and those alleged by DOJ were not coextensive; for instance, the class plaintiffs alleged both procedural and substantive due process violations, while the DOJ complaint in intervention alleged only that substantive due process was violated. When the district court held in the Bench Trial Order that no constitutional violations were occurring, its holding was necessarily limited to substantive due process; anything further would be beyond the DOJ complaint and thus not "critical and necessary" to the judgment. Therefore, the State has not shown that the court's finding in the DOJ case that the State was providing a constitutionally adequate level of care addressed every constitutional violation to which the Consent Decree was directed.

31

not recur. Because of this failure, the State's reliance upon Evans v. City of Chicago, 10 F.3d 474 (7th Cir. 1998) (en banc), and David B. v. McDonald, 116 F.3d 1146 (7th Cir. 1997), is misplaced. In Evans the Seventh Circuit held that a consent decree should be vacated because of a subsequent change in the law; it was determined that the alleged equal protection violation and the alleged due process violation, which comprised the federal claim upon which the consent decree was based, were wholly without merit, thus leaving no substantial claim under federal law to sustain the consent decree. The decisive opinion in that case by Judge Ripple concluded that that change of law made "further enforcement of the consent decree by the district court inappropriate under the standards set forth by the Supreme Court in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 762-64 (1992)." Evans, 10 F.3d at 483. In David B. the Seventh Circuit held that a subsequent change of law, the enactment of a state statute relieving the defendant agency of its authority over certain juvenile treatment programs that were the subject of the consent decree, warranted either modification or vacation of the consent decree. In remanding to the district court, the Seventh Circuit instructed that the court should "determine whether a substantial federal claim supports the decree as a whole; if not, the entire decree must be lifted." David B., 116 F.3d at 1150. Unlike Evans and David B., the State in the instant case has

32

failed to demonstrate the absence of a substantial federal claim[13]; the State has

failed to demonstrate the absence of an ongoing constitutional violation, and has

failed to demonstrate that there is no likelihood that constitutional violation will

recur.[14]

---

[13]Moreover, the State has not argued in its brief on appeal that the "substantial federal claim" referred to in Evans and David B. should be strictly construed to embrace only direct and proven constitutional violations as opposed to related provisions of the Consent Decree. In other words, the State has not argued that there is tension between Evans and David B., on the one hand, and the Supreme Court's decision in Rufo:

> Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. ... But we have no doubt that, to 'save themselves the time, expense, and inevitable risk of litigation,' ... petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires ... [so long as the same] was related to the conditions found to offend the Constitution."

502 U.S. at 389, 112 S.Ct. at 762-63. Because no such argument was raised by the State, and any possibly related argument was inadequately briefed, we do not address it. If raised on remand, we prefer for the district court to address the issue in the first instance.

[14]Because we reject the State's contention that the Bench Trial Order conclusively determined that the State had met all of its obligations to provide a constitutionally appropriate level of care, we do not reach the State's succeeding argument – which was entirely dependent on the faulty premise – that a court loses jurisdiction to enforce compliance with a consent decree settling constitutional claims as soon as the defendant crosses the threshold of constitutionally acceptable performance, regardless of whether the decree purports to require more. We note that the Supreme Court has recently heard arguments in a case on the closely related issue of whether the Eleventh Amendment is waived when a state enters into a consent decree to settle an unlitigated case in which prospective injunctive relief is sought under the doctrine of Ex parte Young, *supra*. See Frazar v. Gilbert, 300 F.3d 530 (5th Cir. 2002), *cert. granted sub nom*, Frew v. Hawkins, 123 S.Ct. 1481 (Mar. 10, 2003). Frazar is not our case, because it arose in the setting of a motion by the plaintiff class members to enforce the terms of the decree. The case was therefore not evaluated under Rufo; rather, the burden was properly placed upon the plaintiffs to demonstrate the violation of a federally protected right justifying relief. See Frazar, 300 F.3d at 543. Nevertheless, the Court's answer to the Eleventh Amendment question posed in Frazar could provide guidance in our related inquiry. We therefore are especially hesitant to

(d)     Substantive Claims – Summary

In sum, we conclude that the State bears the burden of establishing that changed circumstances warrant modification or vacation of the Consent Decree. The State has failed at this stage of the litigation to establish that any of the after-occurring developments of law or fact on which the State relies would compel a district court to grant more than the considerable measure of relief from the Decree that the court below extended.  The State has failed to establish that no live controversy existed, or that changed circumstances warrant vacation of the Decree, or that no violations of federally protected rights were occurring or likely to occur. Consequently, the district court did not abuse its discretion in declining to terminate the remaining provisions of the Consent Decree.

B.     Attorney Fees – Case # 02-14670

The State appeals the district court's order of August 5, 2002, denying its motion for an award of attorneys' fees.  The district court found that the State failed to make the showing required by Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694 (1978), which provides that a prevailing defendant in a civil-rights action may be awarded attorneys' fees when it is shown that the plaintiff's case was "frivolous, unreasonable, or without foundation."

---

venture a gratuitous interpretation.

34

The State contends that, pursuant to the fee-shifting provision of CRIPA, 42 U.S.C. § 1997c(d), it was entitled as the prevailing party to recover its legal fees from DOJ. The State raises three lines of argument: (1) the plain language of Section 1997c(d) indicates that the "prevailing party" is entitled to fees, regardless of whether the party is plaintiff or defendant; (2) the district court erred in applying Christiansburg because the history and purpose of Section 1997c(d) are unlike those of other fee-shifting provisions for which Christiansburg was coined, and (3) even if Christiansburg supplies the standard, the district court employed it erroneously, by too literally applying the "frivolity" requirement and by failing to recognize the DOJ's vexatious litigation conduct.

We review a district court's decision to award or not to award attorney fees for abuse of discretion. Sayers v. Stewart Sleep Ctr., 140 F.3d 1351, 1353 (11th Cir. 1998); EEOC v. Reichhold Chemicals, 988 F.2d 1564, 1568 (11th Cir. 1993). Under the "American Rule," the default assumption is that each party is responsible for its own legal fees, and thus fees ordinarily will not be awarded to the prevailing party without express statutory authority. Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res., 532 U.S. 598, 602, 121 S.Ct. 1835, 1839 (2001) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612 (1975)). Congress has chosen to modify the American Rule in

35

numerous statutes, including the Civil Rights Act of 1964 and the Voting Rights Act Amendments of 1975, so as to provide for the prevailing party to recover its reasonable attorney fees from the loser.

Section 1997c(d) is one such statute. It provides, in its entirety:

> In any action in which the United States joins as an intervenor under this section, the court may allow the prevailing party, other than the United States, a reasonable attorney's fee against the United States as part of the costs. Nothing in this subsection precludes the award of attorneys fees available under any other provisions of the United States Code.

In Christiansburg, the Supreme Court held that, even where a statute is facially neutral as to which party can receive attorney fees, two equitable considerations weigh in favor of a more lenient standard when awarding fees to the plaintiff as opposed to the defendant: first, the prevailing plaintiff is serving to vindicate important federal rights as Congress' designated instrument of enforcement (the "private attorney general" rationale), and second, "when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." Id. at 418-19, 98 S.Ct. at 699.

### 1. The State's Section 1997c(d) Argument

The State first argues that the CRIPA statute itself makes an award of attorneys' fees to a prevailing defendant presumptively appropriate. This argument

overlaps with the following argument and will be dealt with principally in subsection (2), *infra*. It is enough to observe here that, because Section 1997c(d) is permissive and not mandatory – it says the court "*may* allow" attorneys' fees – a fee award is not automatic. See Christiansburg, 434 U.S. at 418, 98 S.Ct. at 699 (interpreting same statutory term – "may allow" – in Title VII fee statute, and rejecting a similar argument that prevailing defendant is presumptively entitled to award). Consequently, there must be standards to guide the district court's exercise of discretion. Thus the only real question is what legal standard governs, and whether the district court applied it properly.[15]

### (2)    Applicability of *Christiansburg* Standard

The State's principal point is that Section 1997c(d) is simply different from other fee-shifting statutes in wording and in intent, and thus the rules of interpretation governing those other statutes do not apply. Its argument begins with the wording of the statute itself. Since the statute excludes the United States from receiving a fee award, and since it speaks in terms of recovery of fees "against

---

[15]As the State acknowledges, courts have routinely read standards into similar discretionary fee-shifting statutes even where none appears. See, e.g., Bruce v. City of Gainesville, 177 F.3d 949 (11th Cir. 1999) (applying Christiansburg dual standard to Americans with Disabilities Act fee-shifting provision, 42 U.S.C. § 12205, which speaks neutrally in terms of allowing a reasonable attorney's fee to the "prevailing party"). Therefore, the fact that the statute contains no "frivolity" language does not mean that a court cannot impose such a standard consistent with the statute.

the United States," the provision appears – unlike other civil-rights statutes – to be intended solely for the benefit of prevailing <u>defendants</u>.  Thus, the State argues, the analysis applied to other fee-shifting statutes, which are principally intended to benefit prevailing plaintiffs, is irrelevant.  The State then argues that the purpose of fee-shifting provisions – to encourage private plaintiffs who may lack financing to take the lead in enforcing anti-discrimination laws as "private attorneys general" – does not apply to CRIPA, since it does not involve a private plaintiff of limited means.  Therefore, the State contends, the caselaw based on that policy should not control.

We do not entirely accept the State's logic. It does not necessarily follow that, because it is harder (or in this case, impossible) for a prevailing plaintiff to get attorneys' fees, it should be easier for a prevailing defendant to obtain fees.  In enacting CRIPA, Congress weighted the equities in favor of prevailing defendants by disqualifying the Government from receiving fees even if it prevails.  There is thus no compelling equitable reason for courts to make the system even more favorable to defendants.[16]

---

[16]Congress has already built an extra measure of protection into CRIPA for defendants by empowering DOJ to intervene only in cases where there are "egregious or flagrant conditions" causing "grievous harm."  42 U.S.C. § 1997(a).

As discussed *infra*, the state of the law when Congress enacted CRIPA was that prevailing defendants could qualify for attorneys' fees only by showing that the plaintiff's case was frivolous, unreasonable or without foundation. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." In re Colortex Indus., Inc., 19 F.3d 1371, 1375 n.2 (11th Cir. 1994) (quoting Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot., 474 U.S. 494, 501, 106 S.Ct. 755, 759 (1986)). If Congress wanted to lower the bar for a prevailing defendant under CRIPA, it could and should have said so. We can infer no such intent from its silence.

It is probably true that the risk of having to pay the opponents' legal fees would be a greater deterrent to a private plaintiff than to the Justice Department, thus reducing the public-policy concerns that normally mitigate against making plaintiffs pay attorneys' fees. However, since only a government entity can be sued under CRIPA, the equities on the defendant's side are also weaker, as we need not worry that the expense of this litigation will put the State of Florida out of business.

Outside of the intellectual property arena, which we find readily distinguishable – see n.17, *infra* – the State has not identified any federal statute

39

similar to ours that presumptively entitles the prevailing defendant to attorney fees. To the extent that the standard varies from <u>Christiansburg</u> at all, it varies in the other direction, making it *harder* for defendants to obtain fees. <u>See, e.g.,</u> <u>Turlington v. Atlanta Gas Light Co.</u>, 135 F.3d 1428, 1427 (11th Cir. 1998) (rejecting <u>Christiansburg</u> and applying "bad faith" requirement of Fair Labor Standards Act to defendant's request for attorney fees under Age Discrimination in Employment Act, 292 U.S.C. § 626(b)). In light of this background of attorneys' fee law, we cannot infer from Congress' silence in CRIPA an intent to lower the established bar and carve out a uniquely favorable standard for government defendants. Further, the other equitable factor in <u>Christiansburg</u> – that an award against a losing defendant, unlike a losing plaintiff, is an award against a federal lawbreaker – still applies in the context of CRIPA. We therefore see no compelling equitable argument that requires altering the normal legal standard by which fees are awarded.

Significantly, <u>Christiansburg</u> itself involved an award against a federal agency – the EEOC – and this Circuit has continued to apply the established standard in discrimination cases brought by the EEOC, with no indication that a different standard should apply because the Government was the losing plaintiff. <u>See</u> <u>Reichhold Chemicals</u>, 988 F.3d at 1571-72 (overturning district court's fee

40

award because EEOC succeeded in presenting a *prima facie* case of discrimination, indicating that its claims were not frivolous); EEOC v. Pet, Inc., 719 F.2d 383, 384-85 (11th Cir. 1983) (stating that even though EEOC failed to establish *prima facie* case, its litigation strategy was not unreasonable and could have succeeded under different circumstances; thus, under Christiansburg, case was not so frivolous as to support fee award).

The principal purpose of CRIPA was to promote the involvement of the Justice Department in institutional reform litigation; the legislative history indicates that Congress recognized that the participation of DOJ in disability discrimination cases was invaluable. See S. REP. NO. 96-416 (1979) at 19-22, *reprinted at* 1980 U.S.C.C.A.N. 787, 801-03 (discussing barriers to litigation faced by mentally disabled plaintiffs, and "unique and invaluable" role of Attorney General in bringing class actions on their behalf). It thus is logical to interpret Section 1997c(d) *in para materia* with fee-shifting provisions in other discrimination statutes that were, similarly, designed to promote and reward the involvement of plaintiffs in furthering the statutes' intent.

Although Christiansburg arose in a Title VII discrimination case, courts have applied its standard to other fee-shifting statutes, particularly those in the civil-rights arena (such as the ADA and the Voting Rights Act), which are worded

similarly to the Title VII standard and to the Section 1997c(d) standard at issue here. The statute applied in Christiansburg, 42 U.S.C. § 2000e-5(k), states that "the court, in its discretion, may allow the prevailing party, other than the [EEOC] or the United States, a reasonable attorney's fee ... and the [EEOC] and the United States shall be liable for costs the same as a private person." Almost identical wording appears in Section 1997c(d). Use of the same or similar language in two fee-shifting statutes "is a strong indication that they are to be interpreted alike." Independent Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 759 n.2, 109 S.Ct. 2732, 2735 n.2 (1989) (internal quotes omitted).[17]

The published legislative history on Section 1997c(d) is extremely sparse. The Senate report states only: "An amendment was accepted ... which would allow the prevailing party other than the United States a reasonable attorney's fee at the discretion of the court." See S. REP. 96-416, at 31 (1979), *reprinted at* 1980

---

[17]The State argues that courts sometimes have declined to apply the Christiansburg standard to fee-shifting statutes worded similarly to Section 1997c(d). However, its principal example is the copyright statute, 17 U.S.C. § 505, which is unlike CRIPA in purpose or history. In Fogerty v. Fantasy, Inc., 510 U.S. 517, 114 S.Ct. 1023 (1994), the Supreme Court found that frivolity was not a prerequisite to an award of attorney fees to a prevailing defendant in a Copyright Act suit because: (1) the Copyright Act language was enacted in 1976, before Christiansburg became the accepted legal standard; (2) all other intellectual property statutes have "loser pays" regimes which are party-neutral; (3) the goal of the Copyright Act was not to promote or reward public-interest litigation, and (4) unlike in civil-rights suits, it is unlikely that plaintiffs in copyright suits will be indigent. Only the fourth concern arguably applies in our case, because of the Justice Department's financial resources.

U.S.C.C.A.N. 787, 813. A footnote adds: "This provision is similar to that found in Title VII of the Civil Rights Act of 1964. See Christiansburg Garment Co. v. EEOC, 434 U.S. 412." See id. at 68, n.86, 1980 U.S.C.C.A.N. at 832. The House conference report, H. CONFC. REP. NO. 96-897 (1980), *reprinted at* 1980 U.S.C.C.A.N. 832, says in explaining the fee-shifting provision: "The award is discretionary with the court, and it is intended that the present standards used by courts under the civil rights laws will apply." See id. at 12, 1980 U.S.C.C.A.N. at 837.

The DOJ argues that the reference to "present standards" in the House report, and the explicit citation to Christiansburg in the Senate report, leave no doubt that Congress contemplated application of Christiansburg, which was decided just two years earlier. The State contends, however, that the reference to "present standards" could just as easily refer to the Supreme Court's decision in Newman v. Piggie Park Enter., Inc., 390 U.S. 400, 88 S.Ct. 984 (1968), which makes an award of fees the default assumption unless it is shown that an award would be "unjust."

Piggie Park, however, was a case in which a prevailing *plaintiff* sought attorneys' fees under Title II of the Civil Rights Act. By its own terms, the case applies where the applicant for attorneys' fees has been successful in obtaining an injunction, see id. at 402, 88 S.Ct. at 966, which obviously refers to plaintiffs. That

distinction was made abundantly clear in Christiansburg, which cited and distinguished Piggie Park. See Christiansburg, 434 U.S. at 418-19, 98 S.Ct. at 699 ("[A]s emphasized so forcefully in Piggie Park, the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority.") (internal quotes and citation omitted). Thus, it is apparent that by 1980, when Congress enacted CRIPA, the prevailing legal standard for the award of attorneys' fees to a prevailing defendant was Christiansburg, not Piggie Park.

The State offers as an alternative standard to Christiansburg the Sixth Circuit's decision in Geier v. Richardson, 871 F.2d 1310 (6th Cir. 1989).[18] We decline the State's invitation to adopt the reasoning of Geier, which found Christiansburg inapplicable in the context of an unsuccessful complaint in intervention by the Government in a Title IX desegregation case. Geier is factually

---

[18]The State also suggests in its briefs on appeal that the Court look for guidance to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), which presumptively entitles the prevailing party to an award of fees unless the opponent's position is "substantially justified" or "special circumstances" make an award unjust – a standard the State describes as more favorable The State concedes, however, that the EAJA by its terms does not apply to this case and is of instructive value only. The State did not argue for application of the EAJA standard below. Indeed, its brief to the Magistrate Judge mentioned the EAJA only fleetingly and by way of distinction, in arguing that the State should automatically recover its fees without surmounting any additional barrier. Because the EAJA argument presented here was not properly raised below and was not addressed by the district court, we decline to address it here in the first instance.

unlike our case. There, the Government opposed a consent decree agreed upon between the private plaintiffs and the state. The Government lost its case against a state government <u>and</u> the private plaintiffs. The private plaintiffs were suing to enforce their civil rights in a Title IX desegregation case, and therefore were the private attorneys general seeking to enforce the statute, <u>i.e.</u>, the parties whom the case law is reluctant to chill. <u>Geier</u>, 871 F.2d at 1314. Moreover, the <u>Geier</u> court saw the Government's litigation conduct as unusually egregious; the Government switched sides and attacked the parties' consent decree after having supported it, thus forcing the original opposing parties to unite in defending it. Thus, even though the Sixth Circuit did not use the words "frivolous" or "bad faith," attorneys' fees might well have been justified under <u>Christiansburg</u>.

In sum, we hold that <u>Christiansburg</u> is applicable to a claim for attorney fees under CRIPA. The same policy arguments the State mounts here were applicable to <u>Christiansburg</u>, yet the Supreme Court obviously was not persuaded that a different set of standards should apply when the Government is the unsuccessful plaintiff.

      (3)    <u>The District Court Correctly Applied the *Christiansburg* Analysis</u>

45

As a fallback, the State argues that it was entitled to attorney fees even if Christiansburg applies. The State contends that the district court erred in analyzing the Christiansburg factors by failing to take account of DOJ's unreasonable litigation conduct, in particular its refusal to settle any claims even after learning of GPW's imminent shutdown.

That the DOC lost on all counts does not, of course, establish frivolity by itself. Christiansburg cautioned against such hindsight bias:

> [T]he term meritless is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case ... [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.

Id. at 421-22, 98 S.Ct. at 700. In EEOC v. Pet Inc., 719 F.2d 383, 384 (11th Cir. 1983), we interpreted Christiansburg's caution against second-guessing to require that, when determining whether a claim was or became frivolous, we view the evidence in the light most favorable to the *non*-prevailing plaintiff. We have recognized that the showing required to support a finding of frivolity is a "stringent" one, see Walker v. NationsBank of Fla., 53 F.3d 1548, 1558 (11th Cir. 1995).

46

There is no dispute that our decision in <u>Sullivan v. School Bd. of Pinellas County</u>, 773 F.2d 1182 (11th Cir. 1985) provides the framework to assess whether a plaintiff's claim was frivolous for purposes of an attorney fee award. In <u>Sullivan</u>, a Title VII discrimination case, we set down "general guidelines" for analyzing the strength of the plaintiff's case against the <u>Christiansburg</u> standard: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." <u>Id.</u> at 1189. The <u>Sullivan</u> court reversed the district court's award of legal fees, concluding that the plaintiff's case was not "patently devoid of merit" based on the facts that: the case survived a Rule 41(b) motion to dismiss; the defendant never moved for summary judgment; the plaintiff produced anecdotal evidence that her supervisors were biased against women and Jews; and the plaintiff's own testimony, if believed, would have supported a reasonable jury finding that she suffered from gender and religious discrimination.

The <u>Sullivan</u> factors here point, if anything, against an award of fees. The case was not dismissed before trial, and the Magistrate Judge found (and the district court agreed) that DOJ established a *prima facie* case. That conclusion of fact is not clearly erroneous, for the reasons set forth in the district court's decision: DOJ put forth expert testimony and documentation that, if believed, could have

47

supported a reasonable trier of fact's finding that the State was providing constitutionally inadequate care, and thus if the state had moved for summary judgment, it would have been denied. There is no evidence that the State made a settlement offer that DOJ rejected, and the State does not so allege.

The State's only real evidence that the DOJ pursued an unreasonable litigation strategy is the fact that DOJ did not drop or amend claims in light of the planned closure of GPW. The trial court, however, found that DOJ's conduct was reasonable given the lengthy period (two years) between the announcement and shutdown, and the concern for patient safety during the interim. Consequently, the district court's application of the Christiansburg/Sullivan factors was not clearly erroneous.

## IV. CONCLUSION

For the foregoing reasons, and in light of the instant record or lack thereof, we cannot conclude that the district court abused its discretion in denying the State's Rule 60(b) motion for relief from the Consent Decree (Case No. 02-13499),[19] and we cannot conclude that the district court erred in its decision not to

---

[19]We sympathize with the State's desire to be freed from the court supervision inherent in the Consent Decree. We fully expect the State will renew its motion for relief after marshaling evidence as to the patients discharged from GPW since September 1999, and we are confident that the district court will entertain such a motion, conduct appropriate evidentiary hearings, and render its decision after receiving the guidance of adequate briefing.

award attorneys' fees to the State after the DOJ Bench Trial (Case No. 02-14670).

Accordingly, the decisions below are

**AFFIRMED**.