[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10957

_____

D.C. Docket No. 1:88-cv-02406-FAM

DAVID PEERY,

Plaintiff-Appellant,

versus

CITY OF MIAMI,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 1, 2020)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT and HULL, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the district court abused its

discretion when it terminated a consent decree that regulated how the City of

Miami treats its homeless residents. Twenty years after the consent decree's

adoption, the City moved to terminate it based on changed circumstances, fulfillment of its purpose, and substantial compliance with its requirements. The homeless argued the City was still systematically violating the consent decree and moved the district court to hold the City in contempt and sanctioned for committing the violations. The district court ruled the City had not violated the consent decree, granted its motion for termination, and denied the opposing motion for contempt. Because the district court correctly interpreted the decree and did not abuse its discretion by terminating the decree, we affirm.

## I. BACKGROUND

In 1998, the City of Miami entered into a consent decree concerning its treatment of the homeless. The decree arose out of a complaint filed by a class of homeless persons against the City. The district court determined the City had unconstitutionally arrested homeless persons for "life-sustaining conduct" and "used the arrest process for the ulterior purpose of driving the homeless from public areas." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1566, 1580–83 (S.D. Fla. 1992). After mediation, the parties reached a settlement agreement known as the *Pottinger* Agreement, which the district court adopted as a consent decree.

Under the consent decree, the City "adopt[ed] a policy . . . to protect the constitutional rights of homeless persons, to prevent arrests and harassment of these persons, and the destruction of their property, inconsistent with the

2

provisions of this Settlement Agreement." The consent decree mandated a variety of City policies, including restrictions on how City employees may interact with the homeless and dispose of their property. For example, it created a category of "life sustaining conduct" misdemeanors: activities like camping in parks or loitering in restrooms. When police observe a homeless person committing such a crime, they ordinarily may arrest the person only if there is available shelter, the officer offers shelter, and the person refuses the shelter. The City also promised to respect the personal property of the homeless and to follow its internal procedures for taking custody of that property. The consent decree ordinarily bars the City from "destroy[ing] any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person," such as "belongings organized or packaged together in a way indicating it has not been abandoned." But it permits the City to dispose of property that "is contaminated or otherwise poses a health hazard to [City] workers or to members of the public."

In 2013, the district court granted the motion of the homeless to add Carole Patman and David Peery as class representatives; the original class representatives were either deceased or unlocatable. Shortly thereafter, in 2014, the district court approved the parties' proposed modification to the consent decree. Among other changes, the modification narrowed the scope of "life sustaining conduct" misdemeanors. Under the revised consent decree, "after one warning," individuals

3

may not block otherwise-walkable sidewalks. Subject to the modification, the City of Miami has been bound by the consent decree for more than 20 years.

After it adopted the decree, the City enacted internal reforms and programs to support the homeless. The Homeless Trust, the funder and overseer of the "continuum of care" for the homeless in Miami-Dade County, manages a panoply of services that did not exist before the decree. Its programs include homeless assistance centers, a hotline for homeless persons seeking aid, and housing and healthcare facilities. And the City created outreach teams that help the homeless find the resources they need. These efforts have contributed to a 90 percent reduction in countywide homelessness levels since the adoption of the consent decree. The remaining homeless population consists predominantly of the chronically homeless, who are resistant to offers of shelter.

Against this backdrop, the City in 2018 moved to terminate the consent decree or, at least, to modify it, and provided three reasons for that requested relief. First, it had remedied the underlying constitutional violations and so fulfilled the purpose of the decree. Second, changed circumstances—including increased safety concerns amid the risk of urban terrorist attacks and the rise of the opioid epidemic—made *Pottinger*'s continuation inequitable. Third, substantial, good-faith compliance with the consent decree obviated the need for continued judicial oversight.

4

Simultaneously, the homeless moved to enforce the consent decree and to hold the City in contempt for "systematic" violations of the decree. In particular, the homeless alleged that the City violated the decree during its 2018 clean-up operations. The operations addressed health and sanitation problems at the downtown homeless encampments. One witness described a clean-up site as a "horror movie" and "opioid den" that required a special biohazard waste clean-up crew. The City tried to relocate the encampments' residents before the clean-ups, but some residents remained as the operations began. City workers ordered those individuals to move so that the clean-ups could occur, and some homeless persons lost possessions they left behind during the clean-ups. The homeless alleged that the real purpose of the clean-ups was to target and disperse the homeless and that the move-on orders and takings of property violated the consent decree.

After a seven-day evidentiary hearing, the district court granted the City's request for termination and denied the homeless class's motion for enforcement and contempt. It terminated the decree because the City "ha[d] substantially complied with the core purpose of the *Pottinger* Agreement," that is, "to stop the criminalization of homelessness." The development of extensive non-arrest resources "is exactly the type of durable remedy that requires this Court to cease its oversight of these primarily state functions." The district court found no evidence that would negate a finding of substantial compliance. The district court also found

5

changed circumstances in Miami, but it did not rely on those findings as a basis for termination.

The district court denied the contempt motion because the evidence did not prove any violations of the consent decree, much less by the required standard of clear and convincing evidence. It explained why the City's actions during the clean-ups did not violate the consent decree. The purpose of the clean-ups was to combat "squalor and unsanitary conditions," a goal that benefitted the homeless. The City discarded only property that was "commingled with [items] . . . that clearly pose[d] health and security concerns"—in other words, items *Pottinger* permitted the City to discard. And the consent decree did not forbid police officers from telling the homeless to move, both before the clean-ups and in other circumstances. Finally, the district court declined to make a finding regarding whether arrests of two homeless persons not preceded by warnings to stop obstructing the sidewalk violated the consent decree because there was no evidence of the events leading up to the arrest. Regardless, the district court found that "overwhelming evidence supports the finding that City police will not revert to arresting [homeless] individuals."

## II. STANDARD OF REVIEW

We review a decision regarding the enforcement or termination of a consent decree for abuse of discretion. *Johnson v. Florida*, 348 F.3d 1334, 1341 (11th Cir.

6

2003); *Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1350 (11th Cir. 2000). We review factual findings for clear error. *Johnson*, 348 F.3d at 1341. And we review *de novo* the interpretation of a consent decree and the application of a consent decree to the facts. *Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2003).

### III. DISCUSSION

A district court may terminate a consent decree when "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). As the party seeking termination, the City "bears a heavy burden of persuasion." *Johnson*, 348 F.3d at 1341. But because Rule 60(b)(5) uses the disjunctive "or," the City can prevail if any of the three grounds applies. *Horne v. Flores*, 557 U.S. 433, 454 (2009).

The application of Rule 60(b)(5) is especially flexible in the context of institutional-reform consent decrees like the *Pottinger* Agreement, which "involve[] areas of core state responsibility" and "raise sensitive federalism concerns." *Id.* at 448, 450. Courts must "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 450 (internal quotation marks omitted). To do otherwise is to usurp the role of elected officials and deprive the people of their

7

right to a democratically accountable government. *See generally* Ross Sandler & David Schoenbrod, *Democracy by Decree: What Happens When Courts Run Government* (2003). Once a durable remedy is in place, "continued enforcement of the [consent decree] is not only unnecessary, but improper." *Horne*, 557 U.S. at 450.

The homeless argue that the district court erred in its interpretation and application of the consent decree and that it misapplied the burden of proof for the motion for termination. We consider and reject these arguments in turn. We then explain why the district court was correct to grant the City's motion for termination and to deny the homeless class's motion for enforcement and contempt.

## A. The District Court Correctly Interpreted and Applied the Consent Decree.

Because a consent decree is a contract, we follow the rules for interpretation of contracts and apply principles of state contract law. *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008); *Reynolds v. Roberts*, 202 F.3d 1303, 1312–13 (11th Cir. 2000). In Florida, "the plain meaning of the language used by the parties controls as the best indication of the parties' agreement," so contract terms "should be interpreted in accordance with their plain and ordinary meaning." *In re Std. Jury Instructions—Contract & Bus. Cases*, 116 So. 3d 284, 315 (Fla. 2013). Florida courts look to dictionaries to determine the plain and ordinary

8

meaning of words. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1024 (11th Cir. 2014).

The homeless argue the district court misinterpreted several provisions of the consent decree. We examine each interpretive dispute in turn. Although the homeless identify one misinterpretation, they fail to identify any errors that establish noncompliance by the City.

As modified, the consent decree prohibits City workers from "destroy[ing] any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person . . . except as permissible by law and in accordance with the department's operating procedure, or if the property is *contaminated* or otherwise *poses a health hazard* or *obvious safety issue* to [City] workers or to members of the public." The district court concluded that items are contaminated when they are "commingled with food, soiled materials, and garbage creating a public health crisis." If a bag contains contaminated property, "[d]eciphering what is and is not contaminated inside a bag is difficult and going through a bag that possesses contaminated materials to fish out [uncontaminated materials] is not a requirement of the [c]onsent [d]ecree." The homeless argue that this interpretation erroneously allows City workers to discard property in unsanitary *areas*, instead of requiring an individualized determination whether property is hazardous.

9

We agree with the district court that property becomes contaminated when it is commingled with items that are contaminated or hazardous. Take, for example, personal notes that are "mingle[d] or mix[ed] together" with unsanitary items such as garbage or bodily fluids. *Commingle*, Webster's New International Dictionary (3d ed. 1993). The exposure makes the notes "soil[ed], stain[ed], corrupt[ed], or infect[ed] by contact or association" and "unfit for use [because of] the introduction of unwholesome or undesirable elements." *Contaminate*, Webster's New International Dictionary (3d ed. 1993). And exposure transforms the notes into "a *possible* source of peril, danger, duress, or difficulty." *Hazard*, Webster's New International Dictionary (3d ed. 1993) (emphasis added). Likewise, if a bag has been contaminated or contains contaminated items, City workers need not search through it for still-clean items. The entire bag is hazardous because of the health and safety risks involved. When a worker decides to discard contaminated items, his decision reflects an assessment of each item's status, not that of the surrounding area. Indeed, the City consistently left uncontaminated items, such as "unattended bicycles, which pose no . . . health risk, . . . on the street."

The consent decree also prohibits "destroy[ing] any personal property . . . readily recognizable as property of a homeless person." The district court concluded that it would be "unreasonable" for City workers to credit a non-owner's statement when determining whether property is abandoned, such as when

10

another homeless person tells the workers of the property's status. The homeless argue that this interpretation incorrectly allows police to ignore evidence of property's ownership.

We agree with the homeless that third parties' statements are probative of ownership, particularly because police know that it is common for homeless people to temporarily leave items and to ask others to watch their property during their absence. But it makes no difference here. The consent decree's ban on destruction of readily recognizable property does not apply when the property is contaminated or otherwise a health hazard or obvious safety issue. And the district court found that the City's takings of property were "to discard contaminated property," not due to the unrecognizability of the property as that of a homeless person. As we have explained, the district court correctly understood the consent decree's exception for contaminated property.

Section VI.9 of the consent decree provides that the City "expressly adopt[ed] a policy as provided for herein to protect the constitutional rights of homeless persons, to prevent arrests and harassment of these persons, and the destruction of their property, inconsistent with the provisions of this Settlement Agreement." The district court ruled that, although the consent decree generally prohibited harassment and "specifically prohibited arrests," it did not prohibit the police from ordering the homeless to move. The homeless contend that this

11

interpretation condones police harassment and misconduct less invasive than arrest in violation of a categorical promise to protect the constitutional rights of the homeless. They argue that, by telling homeless persons to "move on," police violate fundamental constitutional rights, including the "right to remain in a public place unaccosted by the government."

The homeless misunderstand Section VI.9 in several ways. To start, this provision is not categorical. It contains two qualifiers: the City "adopt[ed] a policy" to advance the listed objectives only "*as provided for herein*," and the City aims to accomplish the objectives only to the extent they are "[]consistent with the provisions of this Settlement Agreement." Instead of a categorical obligation, the provision operates as a statement of purpose, identifying the goals to be advanced elsewhere in the consent decree. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 34, at 219 (2012) ("[A]n expansive purpose in the preamble cannot add to the specific dispositions of the operative text."). As a prefatory statement, it does not have binding effect; the City violates the consent decree only by violating one of its specific requirements. *Johnson v. Johnson*, 725 So. 2d 1209, 1212–13 (Fla. Dist. Ct. App. 1999).

Moreover, police move-on orders do not raise a constitutional issue. The homeless assert the orders violate their Fourth, Fifth, and Fourteenth Amendment rights. They are incorrect.

12

The homeless urge us to adopt the view of our sister circuit that the Fourth Amendment encompasses a right to remain in any public place. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) We decline to do so. *Bennett* purports to apply *Florida v. Bostick*, 501 U.S. 429 (1991), but *Bostick* cuts the other way. *Bostick* makes clear that even when a person is not free to leave, there is not necessarily a seizure under the Fourth Amendment. *Id.* at 435–36. The key question is whether a reasonable person can "terminate the encounter" with police. *Id.* at 439. A person who is told to leave one place but "remains free to go anywhere else that he wishes" can undoubtedly terminate his encounter. *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015).

To be sure, *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011), recognized a "constitutionally protected liberty interest," for purposes of due process, "to be in parks or on other city lands . . . that are open to the public generally." *Id.* at 1266 (citing *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999) (plurality opinion)). But this liberty interest is neither fundamental, *see Doe v. City of Lafayette*, 377 F.3d 757, 769–73 (7th Cir. 2004), nor limitless. So even if a permanent deprivation of access to public spaces might violate the Due Process Clause, there is no "constitutional right to use public parks under all conditions and at all times." *Catron*, 658 F.3d at 1266–67 n.5; *accord Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 757 (7th Cir. 2012).

13

Police often ask individuals to temporarily leave public spaces, *Salmon*, 802 F.3d at 253, and doing so does not create a constitutional deprivation. Nor are move-on orders inherently harassment. Harassment involves repeated or systematic behavior, and it involves efforts to annoy or bother. *See, e.g.*, *Harass*, Webster's New International Dictionary (3d ed. 1993) ("to vex, trouble, or annoy continually or chronically"); *Harassment*, Black's Law Dictionary (11th ed. 2019) ("Words, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation."); *Harass*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/harass ("to annoy persistently") (last visited Sept. 30, 2020). There is no evidence that the move-on orders were either systematic or intended to annoy. On the contrary, they ordinarily occurred to facilitate needed cleaning. And the orders were temporary: there is no evidence that police threatened the subjects of the move-on orders with arrest or that the individuals risked arrest if they later returned to their preferred locations. Insofar as any member of the homeless class believes his civil rights have been violated, he may seek relief in an individual action. *See* 42 U.S.C. § 1983.

The homeless also erroneously contend the district court should have found the City in violation of the decree for instances where police told individuals to move without first offering services. The consent decree states that, for homeless

14

persons not engaged in any criminal conduct, "[t]here can be no arrest or detention. A law enforcement officer . . . *may* approach the homeless person and advise him or her of shelter, services, or assistance which are then currently available." But "may" alone is not an exclusive term. Because the consent decree does not say that police may approach the non-criminal homeless *only* to offer shelter, police may approach them for other, non-prohibited purposes as well. Scalia & Garner, *Reading Law* § 8, at 93–94; *accord Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246, 1250 (Fed. Cir. 2004). Even if the homeless consider this outcome odd as a policy matter, where the plain meaning of the text is clear, "something that may seem odd . . . is no basis for disregarding or changing the text." Scalia & Garner, *Reading Law* § 37, at 237 (internal quotation marks omitted).

Next, the homeless argue that the phrase "one warning" in the consent-decree modification means one *contemporaneous* warning. The modified decree requires that "after one warning, no person . . . may obstruct a sidewalk in such a way as to endanger other persons by requiring them" to walk on the street instead of an otherwise-walkable sidewalk. The homeless contend that police violate the consent decree by arresting an obstructer without first warning him to desist, even if the obstructer has been warned on several previous occasions. They argue that the consent decree's purpose is to protect the homeless, so we should construe "one warning" to provide maximal protection. But the question is what the text

15

says, and assumptions based on purpose alone beg the question. "No text pursues its purpose at all costs." Scalia & Garner, *Reading Law* § 2, at 57.

If the drafters of the 2014 modification intended to require one warning per homeless-police interaction, they "would have done so expressly." *Dir. of Rev. v. CoBank ACB*, 531 U.S. 316, 325 (2001). Indeed, the modification simultaneously added a requirement that police must give a contemporaneous warning before they may cite a homeless person for littering if there is a usable trash receptacle within 300 feet. Material variations in the text reflect variations in meaning. *See* Scalia & Garner, *Reading Law* § 25, at 170. So we do not read the phrase "after one warning" to mean a warning every time.

Suppose a police officer sees a homeless person obstructing the sidewalk and warns him to stop. The modification establishes that "after [that] warning, [the] person . . . may [not fully] obstruct a sidewalk." If on later patrols the officer sees the same homeless person again obstructing the same sidewalk, must the officer repeat his warning continually to reinstate the prohibition? Perhaps the homeless are right that contemporaneous warnings are desirable. But we must follow the text of the decree and respect the omissions the drafters chose to make. *See* Scalia & Garner, *Reading Law* § 8, at 95–96.

Finally, the homeless point to two "interpretations" by the district court that were not interpretations at all. The district court suggested the homeless "should"

keep important items such as "identifications, prescriptions, eye glasses, or phones" on their person, to minimize the risk of loss. Contrary to the assertion of the homeless, this statement did not create an extratextual requirement; it instead described a best practice. And the district court referenced one instance where police ordered a homeless person to move that was "admittedly under investigation by the City of Miami Police Internal Affairs." The homeless contend that this reference meant that the district court allowed internal investigations to excuse violations of the consent decree. But the district court only described the facts of that episode, and it later correctly concluded that police may tell the homeless to move.

## B.  The District Court Correctly Applied the Burden of Proof on the City's Motion for Termination.

The party seeking to terminate a consent decree "bears a heavy burden of persuasion" to justify termination. *Johnson*, 348 F.3d at 1341. But the party seeking contempt bears the initial burden to show that the consent decree has been violated. *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010). A district court errs if it merges or cross-applies these burdens. *Jeff D. v. Otter*, 643 F.3d 278, 285, 287 (9th Cir. 2011).

According to the homeless, the district court misapplied these burdens. They argue that the district court effectively assigned them the burden on the motion to terminate because the court did not make factual findings in a few instances where

17

the homeless presented evidence. But this argument misunderstands both the standard for termination and the record.

The district court correctly bifurcated its analyses of the two motions. *Cf. Jeff D.*, 643 F.3d at 285. In considering termination, it focused on what the City affirmatively established by looking to City policies, available resources, and testimony from both sides. It then considered whether any alleged violations were significant enough to render the City noncompliant. It found that, even crediting the allegations of the homeless, the actions were not "the type of deviation necessary to find a lack of substantial compliance"; they were "minor" or "trivial" enough not to undermine the consent decree's objectives. Only after applying the burden for termination did the district court consider whether any of the violations met the contempt standard.

Moreover, review for substantial compliance requires considering the totality of the circumstances. *See Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1200, 1203 (10th Cir. 2018). Where the balance of the evidence is close, a few disputed findings or omissions might be outcome-determinative. But the district court found the weight of the evidence by far favored the City. Indeed, the district court suggested that, even construing instances of alleged police misconduct—one of the issues where the homeless say the district court shifted the

18

burden of proof by failing to make factual findings—in favor of the homeless, the City would still satisfy its burden of proving substantial compliance.

The other three "errors" identified by the homeless are of no help either. In two, the district court made factual findings for the City. And in one, any error was harmless.

First, the district court did not ignore the question whether City workers' takings of property violated the consent decree, as the homeless contend. Instead, the district court found the workers' takings complied with the consent decree. City workers took only items that were "commingled with backpacks, mattresses, sheets, food, etc. that clearly pose health and security concerns"—contaminated or hazardous items not protected by the consent decree.

Second, the district court did not leave open whether the City left notices at clean-up sites after taking property. Instead, it found that "[t]he evidence . . . showed that City workers complied with their procedures," including by "le[aving] notes at the scene on the fences to let people know the location of property." To the extent the homeless dispute the factual findings, we affirm them on clear-error review: the findings are "plausible in light of the record viewed in its entirety." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985). Indeed, the homeless acknowledge there is evidence in the record of the City's provision of notice.

19

True, the district court did not discuss past informal objections made by the homeless to the City's practices. And informal consent-decree enforcement can be relevant to evaluating compliance. But the district court's omission was, at most, harmless error. *Cf. John B. v. Emkes*, 710 F.3d 394, 411 (6th Cir. 2013).

What matters is whether the City is "*now* in compliance . . . , and whether [it is] committed to remaining in compliance." *Jackson*, 880 F.3d at 1203 (emphasis added). The district court correctly focused its analysis on the City's 2018 actions to determine whether it was then in substantial compliance. The homeless argue the district court should also have addressed allegations they previously raised informally, but the only possible violations they identify are isolated occurrences from 2009 and 2014. Additional consideration of a few incidents alleged to have occurred several years earlier does not bear on the determination of present compliance.

### C. The District Court Did Not Abuse Its Discretion by Granting the Motion for Termination.

Abuse of discretion is a deferential standard, and our review is especially deferential where, as here, "the District Court has effectively been overseeing a large public institution over a long period of time"—in this case, since 1999. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 394 (1992) (O'Connor, J., concurring in the judgment); *see also Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1121 (9th Cir. 2009) (explaining that the

20

district court is "uniquely positioned" to evaluate consent-decree compliance). We must affirm unless the homeless can prove "there was no reasonable basis for the district court's termination order." *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998). They cannot satisfy their burden: the district court's ruling was both reasonable and correct.

A court should terminate a consent decree if at least one of three grounds is met: if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *Horne*, 557 U.S. at 454. The City argues, and the district court agreed, that it has "satisfied" the judgment through substantial compliance with the consent decree's requirements. Although this ground "has been relied on very rarely" in our caselaw, 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2863, at 450 (2012), the City is correct that it has satisfied the judgment if it is in substantial compliance with the consent decree. *See, e.g.*, *Frew v. Janek*, 780 F.3d 320, 330–32 (5th Cir. 2015). And the district court was correct to find the City in substantial compliance.

To evaluate a motion to terminate a consent decree, the district court begins "by determining the basic purpose of the decree." *United States v. City of Miami*, 2 F.3d 1497, 1505 (11th Cir. 1993). If there is good-faith compliance, the decree is

21

satisfied, and the court may terminate it. *See id.* Because a consent decree is a contract, *Reynolds*, 202 F.3d at 1312, we measure compliance in terms of substantial performance. *Johnson*, 348 F.3d at 1344; *City of Miami*, 2 F.3d at 1508 n.38.

Substantial performance, or substantial compliance, exists when the consent decree's fundamental purpose has been accomplished, and any deviations from the decree are "unintentional and so minor or trivial as not substantially to defeat the object which the parties intend[ed] to accomplish." *Jeff D.*, 643 F.3d at 284, 288 (internal quotation marks omitted). There need not be "strict and literal compliance with the contract provisions." *Id.* at 284 (internal quotation marks omitted); *accord In re Std. Jury Instructions*, 116 So. 3d at 306–07. So "a federal court should terminate supervision once the defendant comes into [substantial] compliance with the law," because "indefinite federal court oversight of state institutions is disfavored." *Johnson*, 348 F.3d at 1341.

The district court identified the "core purpose" of the consent decree as "stop[ping] the criminalization of homelessness." This purpose follows from the history of *Pottinger*: the original lawsuit arose to stop the City from "arresting [the homeless] for the involuntary, harmless acts they were forced to perform in public and seizing and destroying the [property of the homeless] without following its own[] procedures." And that definition accords with our directive that "the purpose

22

of the decree . . . is not to be conceived at too high a level of generality." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1031 n.11 (11th Cir. 2002).

To prove the consent decree's purpose has been "fully achieved," the City had to establish (1) current substantial, good-faith compliance, and (2) that it is "unlikely . . . [to] return to its former ways" absent the consent decree. *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247 (1991). If the City has put a "durable remedy" in place, the district court should terminate the consent decree. *Horne*, 557 U.S. at 450.

The record supports the finding by the district court that the City is in substantial compliance. That finding depends on "the City's record of compliance with the decree," as well as other relevant undertakings. *City of Miami*, 2 F.3d at 1508. The district court found that the City achieved "the goal of the [c]onsent [d]ecree . . . to reform the manner that City [p]olice treated the homeless." All police officers receive training on *Pottinger*'s requirements, and the City has put in place body-camera-usage, records-keeping, and disciplinary procedures to monitor and regulate interactions between the police and the homeless. As a result, the City no longer "arrests . . . the homeless for being homeless." The City also created procedures and training for other City departments, including procedures for handling property. The City provided "ample evidence" these procedures were

23

followed, such as through the placement of notices in advance of clean-ups and the provision of shelter beds for the displaced homeless.

The record also supports the finding that compliance will continue after the termination of the decree. The City of Miami and the surrounding community have developed a wide array of programs. This "continuum of care" includes the Homeless Trust, which receives $60 million in tax revenue each year, and various programs to "provide shelter, medical care, and other services," as well as "to avoid putting the mentally ill in jails." These programs, along with formal police policies, constitute a durable remedy. Because the City has a strong system in place to address homelessness, it is unlikely to revert to arresting or mistreating the homeless.

The homeless argue that the violations hidden by the "misinterpretations" of the decree by the district court, combined with the City's failure to develop consistent procedures for handling the property of the homeless, foreclosed a finding of substantial compliance. We disagree. As we have explained, the district court did not overlook any alleged violations of the consent decree. Nor do the homeless identify any inconsistencies in the City's procedures that could bar a finding of substantial compliance. Compliance is determined in relation to "the object which the parties intend[ed] to accomplish." *Jeff D.*, 643 F.3d at 284 (internal quotation marks omitted). So inconsistencies or violations are relevant if

24

they undermine the goal of "stop[ping] the criminalization of homelessness." But they are not relevant when, for example, the City provides more notice than its policies require, or there is variation in which agency posts the required notice. Even with discrepancies of this kind, there has been "performance nearly equivalent to what was bargained for." *Pullam v. Hercules, Inc.*, 711 So.2d 72, 75 (Fla. Dist. Ct. App. 1998) (internal quotation marks omitted).

### D. The District Court Did Not Abuse Its Discretion by Denying the Motion for Contempt.

Consent decrees "are enforced through the trial court's civil contempt power." *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). A party seeking an order holding the defendant in contempt for violating the consent decree must "move[] the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned." *Id.* The homeless did not specifically ask the district court to issue a show-cause order in their contempt motion. But the district court must apply the procedures for evaluating civil contempt, regardless of whether either party explicitly requests them. *See Mercer v. Mitchell*, 908 F.2d 763, 767 n.7 (11th Cir. 1990).

Before the district court grants a show-cause order, the movant "must first establish by clear and convincing evidence that the alleged contemnor violated a court's earlier order." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (alterations adopted) (internal quotation marks omitted). "The clear and convincing

25

evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002). We construe any ambiguities in favor of the party charged with contempt. *Leshin*, 618 F.3d at 1231. Only if the moving party makes its prima facie showing does the burden "shift[] to the alleged contemnor to produce evidence explaining [its] noncompliance at a show cause hearing." *Id.* at 1232 (internal quotation marks omitted).

The homeless failed to prove any violations of the consent decree, much less any "unambiguous" violations. *Riccard*, 307 F.3d at 1296; *see also Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1062 (11th Cir. 2001) (explaining that conduct cannot implicate contempt if it was in accordance with a "reasonable interpretation" of the consent decree). Because the homeless failed to make the necessary prima facie showing, the burden never shifted to the City to explain its noncompliance, and there was no need for a show-cause hearing. *See Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 821 (11th Cir. 2010). The district court correctly denied the contempt motion.

## IV. CONCLUSION

We **AFFIRM** the termination of the consent decree and the denial of the contempt motion.